UNITED STATES of America,

v.

Orson G. WHITE, Appellant.

UNITED STATES of America,

v.

Lawrence ANDERSON, Appellant.

Nos. 80–1087, 80–1121.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 16, 1980.

Decided Feb. 6, 1981.

As Amended April 10, 1981.

Michael S. Frisch, Washington, D. C. (appointed by this Court), for Orson G. White.

William J. Garber, Washington, D. C. (appointed by this Court), for Lawrence Anderson.

John C. Aisenbrey, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., John A. Terry, Michael W. Farrell and W. Randolph Teslik, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before WILKEY, WALD and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Dissenting opinion filed by Circuit Judge EDWARDS.

WALD, Circuit Judge:

## INTRODUCTION

Close cases involving the exclusionary rule present difficult issues for courts as well as law enforcement officials. This close case [1] presents the question of whether narcotics squad officers acting on an anonymous tip "unreasonably" made an investigatory stop which culminated in an arrest and seizure of narcotics so as to violate the defendants' Fourth Amendment rights and require suppression of the narcotics. The trial court denied the suppression motion and we affirm its decision.

## I. THE FACTS

Orson G. White and Lawrence Anderson were convicted of possession of heroin and possession of heroin with intent to distribute.[2] They contend that the evidence crucial to their conviction was seized in violation of their Fourth Amendment rights.[3]

At about 7:30 on the evening of September 11, 1979, Detective Norman A. Hill of the Metropolitan Police Department Narcotics Branch received an anonymous tip, by telephone, regarding drug traffic in the area of 15th and East Capitol Streets. Tr. 4, 16.[4] The caller said that a young black man known as "Nicky," about 19 or 20 years old, wearing a blue jumpsuit with white stripes, had parked a 1971 Ford LTD in front of No. 1 15th Street, N.E., entered

---

1. The district court called it a "close case" as well. Tr. 92. "Tr." refers to the transcript of the suppression hearing and trial held on November 27–29, 1979. While the dissent blandly asserts that "this is not a 'close case' as the majority suggests," Diss. Op. at 47, the dissent's own excruciating exercise seeking to distinguish cases in which *Terry* stops have been approved by the courts, and relying on essentially irrelevant "stop *and frisk*" cases, suggests quite the contrary.

2. 33 D.C.Code § 402 (possession); 21 U.S.C. § 841(a) (intent to distribute).

3. Appellant Anderson also argues that the evidence against him was insufficient to support the jury's verdict of guilty, and thus that his motion for a directed acquittal should have been granted. After reading the transcript, we conclude that this argument is meritless. He contends as well that certain jury instructions were misleading. The appellant asserts that

one part of an instruction on distribution could have been interpreted by the jurors to mean that the prosecution did not have to prove that each appellant had to personally intend that the drug possessed be distributed, but rather that both could be convicted of possession with intent to distribute if only one had such an intent. We find that the portion challenged on its face reasonably conveys only the interpretation which the appellant admits is proper—that the prosecution need not show that the defendants intended to personally distribute the drug, but only that each intended someone to do so. Moreover, the instructions preceding and following the challenged passage further crystallize this interpretation.

4. "Tr." refers to the transcript of the suppression hearing and trial held on November 27–29, 1979.

a 1974 Oldsmobile four door, and driven away in it. The caller identified the color of the Ford, and supplied the license tag numbers of both cars. Tr. 5–7. He concluded by stating that "Nicky" and the unidentified driver of the Oldsmobile were involved in narcotics traffic and would be "dirty" with drugs when they returned. Tr. 6.

Detective Hill had not used this informer before, Tr. 32; the caller refused to identify himself when asked. *Id.* Neither did he reveal how he came by his information. *Id.*

Immediately upon receipt of the tip, Detective Hill and his partner, Detective Ruben Sanchez-Serrano, drug squad veterans of eleven and eight years respectively, Tr. 120, 208, went to 15th and East Capitol Streets, N.E. in an unmarked police car [5] to establish surveillance. Tr. 8. They found the Ford described by the tipster, parked in front of No. 1 15th Street, N.E. *Id.* While waiting for the Oldsmobile to return, the officers ran a check on the cars' license numbers and registered owners; they found that neither car was reported as stolen and that no criminal warrants were outstanding against their owners.[6] Tr. 49–50.

The detectives spotted the Oldsmobile at the traffic light at 15th and East Capitol Streets at about 7:45. As it pulled behind the Ford, they observed its three occupants:[7] the driver, later identified as appellant Orson White; a black male passenger in a blue sweatsuit, later identified as appellant Lawrence Anderson;[8] and a child in the rear seat, later identified as White's fourteen year old stepson.[9] The officers could see partially inside the car, though it was "dark"[10] or "dusky"[11] out, because the car was parked beneath a high intensity street light.[12] In addition, the dome light inside the car[13] was on, illuminating the upper body portions of the occupants.

Detective Hill promptly pulled the unmarked cruiser alongside the Oldsmobile, stopping at the rear of the left quarter panel to let Detective Sanchez-Serrano out, Tr. 10, and then continued a bit further before exiting himself. The cruiser was placed so as to make it difficult—but not impossible—for the Oldsmobile to pull away. Tr. 18–19. Both officers put on identifying arm bands and approached the car; Hill testified he also attached a police badge to his collar and held his identification holder in his left hand.

Detective Hill testified that he was not certain precisely when he first withdrew his gun from the holster, Tr. 21, but he did so as he approached the car. When he reached the side of the car by the driver, Detective Hill announced, "Police, get out of the vehicle." He said he did so "in a very moderate tone," not "like a raid" but "like a normal approach to the vehicle." Tr. 41.[14] When the driver, White, did not exit promptly, Hill repeated twice in rapid succession, "Get out of the vehicle," and "Place your hands on the dashboard." Tr. 11. White started to place his hands on the dashboard, but stopped and put them back in his lap, becoming "fidgety." *Id.* When testifying as to what he saw White do with his hands, Hill said first that he saw White remove "a tinfoil item" from his pocket, and later that

---

5. Both detectives were in plainclothes.

6. The Oldsmobile was registered in the name of appellant White's mother. Tr. 197.

7. The officers testified that they did not recognize either of the adult occupants from their previous police experience. Tr. 35.

8. Appellant Anderson was called "Nicky."

9. Detective Sanchez-Serrano saw the boy at this time; Detective Hall did not notice him until after their approach towards the car, at which point the boy became hysterical. Tr. 29.

10. Tr. 20 (testimony of Detective Hill).

11. Tr. 53 (testimony of Detective Sanchez-Serrano).

12. Tr. 125.

13. Both officers testified to the fact that the car's interior lights were on even when the doors were closed; they had difficulty turning them off when they left the area. Tr. 20, 53.

14. His partner, Sanchez-Serrano, however, recalled that Hill "yelled." Tr. 53.

"I didn't know what it was at that particular point." Tr. 12, 29.[15] Detective Hill then stepped back from the car, leveled his revolver through the windshield at White, and repeated, "Get out of the car." *Id.*

In the meantime, Detective Sanchez-Serrano approached the car from the passenger's side with his gun out of the holster but at his side and pointed downward. Tr. 53. When he heard his partner "yelling," he ordered Anderson and the boy in the rear seat to "[g]et out of the car," *id.*, since he assumed that Hill had seen something "over there [on the driver's side] that was going to go wrong." *Id.* Anderson exited the vehicle; Sanchez-Serrano grabbed him and brought him around to the hood on the driver's side of the car.

They reached the driver's side just as White was emerging from the car. Tr. 54. As White stepped out, a tinfoil fell to the ground. Tr. 13. Detective Hill grabbed White with one hand, holstered his revolver[16] and picked up the tinfoil with the other. *Id.* Feeling something in it, he placed both appellants under arrest, *id.*, and had his partner call for backup units.

Detective Sanchez-Serrano retained custody of the two appellants while Detective Hill searched the car. Hill found additional tinfoils on the floor and seat of the car. In addition, he noticed a shaving bag on the front seat in front of the armrest; when opened, the bag contained cutting agents, measuring spoons, a strainer, a hypodermic needle and other paraphernalia. Tr. 130, 132. He also recovered $400 from appellants' persons.[17]

## II.  THE ISSUE

Prior to trial, appellants moved to suppress the evidence seized from the Oldsmobile, claiming that the search was the fruit of an illegal arrest, unsupported by probable cause, that took place at the point that the officers with guns drawn ordered appellants to exit the car. The district court denied the motion to suppress on the ground that the policemen's initial actions amounted to no more than an investigatory stop; the arrest, the trial judge concluded, took place only upon White's exit when Detective Hill saw the tinfoil fall out of the car, providing the requisite probable cause for the arrest.[18]

Appellants appeal from the trial judge's ruling that the police actions preceding the arrest constituted a valid investigatory stop under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), rather than an illegal arrest without probable cause. Because the government has conceded that probable cause for arrest did not exist at the time the officers approached the car, Appellee's Brief at 12, and the appellants in turn do not contest the finding that probable cause for arrest did exist once Detective Hill sighted the tinfoil on White's exit, the question is whether the detectives' actions leading up to White's exit from the car constituted an infringement of appellants' Fourth Amendment rights to be free from unreasonable seizures.

15. Detective Hill also testified that he saw passenger Anderson "remove from his waist area a tinfoil" which he "had reason to believe ... contained possible narcotic substance." Tr. 12.

16. The dissent implies that Hill left White unguarded while he reached for the tinfoil. In fact, the transcript makes clear that Sanchez-Serrano was standing behind both appellants, covering them with his service revolver, at the time White holstered his gun to pick up the packet of drugs. Tr. 13, 54.

17. There was considerable dispute at trial as to which appellant the money came from, but the resolution of that issue is unnecessary to the disposition of this appeal.

18. The trial judge did not accept Detective Hill's testimony that he had seen tinfoils on the persons of both White and Anderson in appellants' car prior to the time White exited. Tr. 93. However, at trial, both White and Anderson admitted that Anderson panicked when he saw the police and scattered the tinfoils around the car, Tr. 295, 326; White explained his "fidgeting" as an attempt to brush the tinfoils off him. Tr. 303–04. Although neither their testimony nor Hill's about the tinfoils' presence in the car is cognizable for purposes of appeal from denial of the suppression motion, we note that their stories are consistent.

## III. ANALYSIS

### 1. *Distinguishing Between An Investigatory Stop and An Arrest*

The Supreme Court first recognized the legitimacy of an "investigatory stop" in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Terry* defined such a "stop" to include "an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure." *Id.* at 20, 88 S.Ct. at 1879. In such situations, the Court held, police actions must be tested "by the Fourth Amendment's general proscription against unreasonable searches and seizures," *id.*, rather than by the strict probable cause standard traditionally applied to judge arrests. *See also Bailey v. United States*, 389 F.2d 305, 314 (D.C.Cir.1967) (Leventhal, J., concurring) (*citing Dorsey v. United States*, 372 F.2d 928, 931 (D.C.Cir.1967)) ("If policemen are to serve any purpose of detecting and preventing crime by being out on the streets at all, they must be able to take a closer look at challenging situations as they encounter them.").

The Court has frequently reminded us since, however, that the *Terry* exception was meant to be of "narrow scope," *Ybarra v. Illinois*, 444 U.S. 85, 93, 100 S.Ct. 338, 343, 62 L.Ed.2d 238 (1979), and not a means by which to legalize otherwise illegal arrests. Indeed, in *Terry's* companion case, *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917, (1968), the Court reversed the conviction of a defendant [19] because it found the challenged search to be incident to an illegal arrest [20] rather than part of a valid investigatory stop. *See also Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (detention of suspect at police station for interrogation indistinguishable from traditional arrest and not a valid *Terry* stop). *Terry* authorizes no more than "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information," *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972), and permits a "limited search ... not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence." *Id.* The initial stop cannot be a random exercise, *see Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (reversed drug conviction based on evidence obtained in purely random search), but must be justified by "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion," *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968).[21]

### 2. *Was This a Stop or An Arrest?*

The first question posed by this case is whether the actions of the police, from the time the officers left their own car until the moment the tinfoil fell out of the appellant's car and Detective Hill grabbed White, constituted merely an investigatory stop or a fullfledged arrest. When a "stop" ends and an arrest begins has been the subject of numerous judicial decisions. *See, e. g., United States v. Hill*, 626 F.2d 429 (5th Cir. 1980); *United States v. Wylie*, 569 F.2d 62 (D.C.Cir.1977), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978). Judge Leventhal, concurring in *Bailey v. United States*, 389 F.2d 305 (D.C.Cir.1967), provides a framework for considering the question:

> Whether there has been an arrest turns on whether there has been an imposition of custody, *and this is a determination made after examining both the objective*

---

**19.** *Sibron* was a consolidated case. The conviction of the other defendant was affirmed on the ground that it was pursuant to a lawful arrest. 392 U.S. at 66, 88 S.Ct. at 1904.

**20.** The state had conceded that probable cause was lacking at the time of the encounter and ensuing search. *Id.* at 62, 88 S.Ct. at 1902.

**21.** There is still debate over whether *Terry* authorizes a brief detention for investigative purposes where no officer has observed behavior suggesting criminal activity. *See* Preiser, *Confrontations Initiated by the Police on Less Than Probable Cause*, 45 Albany L.Rev. 57 (1980).

*circumstances and the subjective feeling those circumstances are likely to evoke.* *Id.* at 314 (emphasis supplied). Among the circumstances courts consider when making this decision are: the officer's intent in stopping the citizen; [22] the impression conveyed to the citizen as to whether he was in custody or only briefly detained for questioning; [23] the length of the stop; [24] the questions, if any, asked; [25] and the extent of the search, if any, made. [26]

The lines drawn are not always sharp ones. Each situation is unique, involving the weighing and measuring of contrary indicators. However we conclude, as did the trial judge, that this was an investigatory stop, not an arrest.

The officers testified that they initially intended to question, not arrest, the appellants. Hill decided to make the stop to "further my investigation." Tr. 44. He had an agenda for accomplishing this end. He intended to:

> ascertain their names. I would have checked the car . . . by making a visual inspection of the car in the front and back . . . from the outside. And at that

point if I hadn't found nothing, I would have said, "You are free to go," and that would have been it.

Tr. 44–5.

The usefulness of such an identity check and visual inspection is apparent. A visual inspection of a car can reveal narcotics or weapons "in plain view" so as to justify an arrest. Even if a stop does not give rise to probable cause, the officers learn the occupants' identities, knowledge which may be useful at a later date.

■ What makes the case at hand difficult is the amount of force used to effectuate the stop. The officers approached the car with drawn, though not pointed or raised, guns [27] and ordered the occupants to get out of the car and to put their hands on the dashboard several times before one officer, Hill, seeing the driver make "fidgety" hand to lap movements, leveled the gun at White. Only at that point did the other officer pull his gun out. Tr. 92. The use or display of arms may, but does not necessarily, convert a stop into an arrest. Courts have generally upheld stops made at gun-

---

22. *E. g., Sibron v. New York*, 392 U.S. 40, 46–7, 88 S.Ct. 1889, 1894, 20 L.Ed.2d 917 (1968) (held not investigatory stop because policeman had no intention of asking questions); *cf. United States v. Bull*, 565 F.2d 869, 870 (4th Cir. 1977), *cert. denied*, 435 U.S. 946, 98 S.Ct. 1531, 55 L.Ed.2d 545 (1978) (testimony of officer that he intended stop-and-frisk, not arrest, accepted).

23. *E. g., United States v. Oates*, 560 F.2d 45, 57 (2d Cir. 1977) ("significant . . . [that customs officers] did not . . . represent in any way that their detainees were being placed under arrest"); *United States v. Richards*, 500 F.2d 1025, 1029 (9th Cir. 1974), *cert. denied*, 420 U.S. 924, 95 S.Ct. 1118, 43 L.Ed.2d 393 (1975) ("An arrest can be made without the use of such [formal words of arrest], . . . the absence of such words . . . indicate that appellant was merely detained for investigative questioning[.]").

24. *E. g., United States v. Richards, supra*, 500 F.2d at 1029; *Arnold v. United States*, 382 F.2d 4, 7 (9th Cir. 1967).

25. *E. g., United States v. Purry*, 545 F.2d 217, 219–20 (D.C.Cir.1976) (held investigatory stop when policeman stopped appellant, asked for identification and about bank robbery); *cf. United States v. Barber*, 557 F.2d 628, 632 (8th

Cir. 1977) (fact that no questions asked indicative of arrest, not investigatory stop).

26. *E. g., Ybarra v. Illinois*, 444 U.S. 85, 93, 100 S.Ct. 338, 343, 62 L.Ed.2d 238 (1979) (conviction reversed because search exceeded frisk for weapons permissible on investigatory stop); *Government of Canal Zone v. Bender*, 573 F.2d 1329, 1332 (5th Cir. 1978) (same).

27. When asked at oral argument, counsel for the government explained that "drawn guns" in this case meant that the guns had been removed from their holsters and were being held at the officers' sides, pointing downward. The dissent calls it "academic" to "worry whether the police were pointing their weapons directly at appellants or not," since "any reasonable person, seeing drawn guns, would feel under the same absolute custodial restraint, wherever the officers' guns were pointed." Diss. Op. at n.19. This is of course pure speculation; there is nothing in the record to indicate whether appellants saw the drawn guns or how they perceived them. We believe that any reasonable person would indeed distinguish between the implications of policemen approaching with guns at their side and policemen approaching with guns leveled at the subjects.

point when the threat of force has been viewed as reasonably necessary for the protection of the officer. Thus where police approach armed robbery suspects in a car with guns drawn, such action has been held to be a stop, not an arrest, *United States v. Diggs*, 522 F.2d 1310, 1313–14 (D.C.Cir. 1975), *cert. denied sub nom. Floyd v. United States*, 429 U.S. 852, 97 S.Ct. 144, 50 L.Ed.2d 127 (1976), as has an armed stop of a plane about to taxi down a deserted runway, *United States v. Richards*, 500 F.2d 1025, 1028 (9th Cir. 1974), *cert. denied*, 420 U.S. 924, 95 S.Ct. 1118, 43 L.Ed.2d 393 (1975). *See also United States v. Bull*, 565 F.2d 869 (4th Cir. 1977), *cert. denied*, 435 U.S. 946, 98 S.Ct. 1531, 55 L.Ed.2d 545 (1978) (drawing of guns prior to approach of suspiciously acting persons in deserted parking lot late at night did not convert stop into arrest); *United States v. Worthington*, 544 F.2d 1275, 1280 n.3 (5th Cir.), *cert. denied*, 434 U.S. 817, 98 S.Ct. 55, 54 L.Ed.2d 72 (1977) (stop at gunpoint on dark, deserted airstrip held investigatory because reasonable); *United States v. Maslanka*, 501 F.2d 208, 213 n.10 (5th Cir. 1974), *cert. denied sub nom. Knight v. United States*, 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975) (reasonable for lone officer to draw guns when approaching car on a lonely highway containing three young males; stop held investigatory). On occasion, however, the courts have ruled that the use of excessive force transformed a stop into an arrest. *E. g., United States v. Strickler*, 490 F.2d 378 (9th Cir. 1974) (encircling a suspect's car with policeman and ordering him out at gunpoint held an arrest); [28] *United States v. Lampkin*, 464 F.2d 1093, 1095 (3d Cir. 1972) (arrest occurred at moment officers approached suspect with drawn guns to detain him).

Rather than assume in this case that because the officers had their guns drawn (but not pointed) they intended or conveyed the impression that an arrest was taking place, we look for an explanation of why they were drawn, and whether that precaution was reasonable in light of all the circumstances. If so, the mere drawing of their guns out of their holsters did not convert the stop into an arrest.

Detective Hill testified that, though the tipster had not said so (and in fact they were not), he was concerned that the suspects might be armed as were a substantial number of the people involved in the 1,000 street drug arrests he had conducted. He thought his prior experiences gave him reason to be concerned about his safety. Tr. 17–21.[29] This concern was not unreasonable. An officer approaching a car in which he has been told narcotics are present can reasonably anticipate that an arrest may at some point ensue. Such an arrest may require a show of force, or provoke an attempt to escape by car,[30] or even an assault.[31] It does not seem unreasonable to

---

**28.** The court in *Strickler* stated:

[W]e simply cannot equate an armed approach to a surrounded vehicle whose occupants have been commanded to raise their hands with the "brief stop of a suspicious individual in order to determine his identity or to maintain the status quo momentarily while obtaining more information" which was authorized in *Williams*.

490 F.2d at 380.

**29.** One survey of drug arrests showed that 10% of drug suspects arrested in Washington included in the survey were armed. Johnson & Bogomolny, *Selective Justice: Drug Law Enforcement in Six American Cities, in* Appendix, Drug Abuse in America, Second Report of the National Advisory Commission on Marihuana and Drug Abuse 543 (1973). Twenty-eight District of Columbia police officers were assaulted with firearms in 1979. Metropolitan Police De-

partment, Washington, D.C., Fiscal Year 1979 Annual Report 59 (1980). Unlike the dissent, we feel the odds too high to require policemen to play "russian roulette" each time they effect a drug arrest.

**30.** The dissent repeatedly stresses the fact that these particular appellants did not attempt to flee. However, it ignores the fact that such flight was possible—the car's ignition was on, it was not completely blocked, and the officers' vision of its occupants activities was obscured. Tr. 57. Therefore, the officers had reason to suspect that appellants might attempt to flee.

**31.** The officers had no alternative short of ordering appellants from the car to learn whether they were armed. Again, appellants' initial refusal to exit and White's furtive hand movements could reasonably provoke fear that they were armed in the arresting officers' minds.

allow the officer to be prepared for such an occurrence by having his gun drawn. That appeared to be the thinking of the trial judge when he upheld the stop, commenting "in view of the fact that it was a serious felony, I think the officers would be a little foolhardy if they approached the car at 7:30 in the evening, a car with three people in it, without their guns, at the ready." Tr. 94.

■ Though this case would be easier if it involved a dark and deserted spot or one lone officer facing a carful of suspects,[32] our reluctance to second-guess the judgment of experienced officers is not limited to such extreme situations. The officers were approaching a car which they had been told contained both traffickers and a cache of narcotics.[33] Reviewing the situation through the "eyes of a reasonable and cautious police officer on the scene, guided by his experience and training," we cannot say that the officers acted unreasonably in being prepared for possible violence. *United States v. Wylie*, 569 F.2d 62, 68 (D.C.Cir. 1977), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978) (*citing United States v. Hall*, 525 F.2d 857, 859 (D.C.Cir. 1976)). This approach took place at night in a central city neighborhood.[34] The officers did not wave or brandish their guns, but rather kept them at their sides when approaching the car. There is no evidence that the force used was excessive. Hence, if the officers had sufficient cause to make a *Terry* stop, *see* pp. 40–45 *infra*, we cannot conclude that simply having their guns drawn and ready would by itself convert the stop into an arrest.[35]

We hold similarly that the officers' orders to the occupants to get out of the car for

32. Though there were three people in the car, one was a child. Moreover, Detective Hill testified that he was unaware of the presence of this third person until after he leveled his revolver in White's face; thus his actions throughout the challenged period were predicated on the presence of only two persons in the car.

33. The dissent quotes a 1968 article by Professor LaFave to the effect that narcotics violations do not justify police action on the basis of anonymous information, Diss. Op. at 59, because they involve no risk of "serious personal injury or grave irreparable property damage." If indeed such an appraisal of narcotics traffic was valid 13 years ago, we must take issue with it now. *See* note 34 *infra*.

34. The trial judge did not ask the officers about whether the area was a "high crime" area at the suppression hearing. When cross-examined on the subject at trial, Officer Hall testified that the area was a high crime area.

We note the dissent itself refers to the area as an "inner-city area" when "wonder[ing]" whether police officers would act similarly in "affluent suburbs nearby Washington (where drug peddling is known to be prevalent)." *See* Diss. Op. at 46.

The "inner city" resident, who must accept overt drug dealing as "part of living," is in our view the real victim of any disparity that exists between such areas and the "affluent suburbs"; the rare efforts of such residents to cooperate with police in apprehending dealers deserve appropriate consideration. *See* Wheeler, *Drugs on O Street 'Part of Living,'* Washington Post, Jan. 3, 1981, at A1, col. 1. This local newspaper article recounts the problems of one "inner city" neighborhood where open drug dealing is rampant on the streets.

*Disputes among dealers and customers erupt periodically in gunfire. At least four fatal shootings have occurred there since May.* The block is crisscrossed by a spider-like network of alleys and narrow streets that provide an instant refuge for the dealers, when police patrols arrive.

But many residents of O Street and adjoining Columbia Street simply have accepted the drug phenomenon as part of their lives and make no attempt to dislodge the dealers and their cohorts by calling the District Building or police.

[T]here is ... pragmatic fear of possible retaliation by drug dealers if the status quo is disturbed. Maintaining the status quo buys protection and an odd kind of stability for the block.

"At first I called the police," said one man who asked not to be identified, "but then my house was broken into, and they bombed the front door. So now I don't call the police, and they don't bother me. You have to be very careful here."

(Emphasis supplied).

35. According to both defendants' trial testimony, Anderson panicked when he found out they were police, not when he saw them approaching with guns drawn. Tr. 326. White said at trial, "I had been arrested before." Tr. 305.

questioning were compatible with an investigatory stop.[36]

Courts have routinely allowed officers to insist on reasonable changes of location when carrying out a *Terry* stop. *See, e. g., United States v. Chatman*, 573 F.2d 565, 567 (9th Cir. 1977) (fact suspect stopped at arrival gate in airport placed in interview room for questioning did not transform stop into arrest); *United States v. Oates*, 560 F.2d 45, 57 (2d Cir. 1977) (court saw "nothing wrong" in agents asking suspects in airport stop to step into nearby airline office, "a place more convenient for interrogation and more conducive to insuring the safety of other passengers in the crowded departure area"). The exigencies of the circumstances determine what moves are reasonable in a given situation, *see Bailey v. United States*, 389 F.2d 305, 313 (D.C.Cir. 1967) (Leventhal, J., concurring) (reasonable for officers approaching suspected getaway car with guns drawn to order occupants to "sit still and keep their hands in sight").[37]

The order to get out of the car in this case was based on the officers' judgment that the situation would be safer and less likely to escalate beyond their control if the questioning was conducted outside of the car. Such a judgment is not unreasonable. In *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), the Supreme Court

> specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile. "According to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile. Bristow, Police Officer Shootings—A Tactical Evaluation, 54 J.Crim.L.C. & P.S. 93 (1963)." *Adams v. Williams*, 407 U.S. 143, 148 n. 3 [92 S.Ct. 1921, 1924 n. 3, 32 L.Ed.2d 612] (1972). We are aware that not all these assaults occur when issuing traffic summons, but we have before expressly declined to accept the argument that traffic violations necessarily involve less danger to officers than other types of confrontations. *United States v. Robinson*, 414 U.S. 218, 234 [94 S.Ct. 467, 476, 38 L.Ed.2d 427] (1973).

*Id.* at 110, 98 S.Ct. at 333. *But see id.* at 118, 98 S.Ct. at 337 (Stevens, J., dissenting) (noting the unreliability of survey used as basis for proposition stated in majority opinion).[38]

Since an officer's view of a suspect seated in a car is always partially obscured, the officer is at a disadvantage both when he approaches the occupant and when he tries to question him through a car window. He cannot scrutinize the suspect's movements as he can a pedestrian's; there is consequently a greater opportunity for the suspect in a car to pull out a hidden weapon. Moreover, the frisk component of a *Terry* "stop and frisk" is not available to protect the policeman if a suspect is sitting inside a closed car and the officer is on the outside.[39]

---

**36.** Hill's first action upon approaching the car and announcing his identity as a policeman was to order the occupants out of the car. This order was repeated "three or four times," Tr. 12, along with an order to "place your hands on the dashboard." Tr. 11.

**37.** Judge Leventhal explained his conclusion:
What the police did was to act reasonably to bring a situation under control; they had no way of knowing whether the car would leave the jurisdiction, and once the occupants scattered it would be nearly impossible to reassemble them again.
389 F.2d at 314.

**38.** One survey of drug arrests in 6 American cities including Washington) showed that 16% of drug arrests took place when the suspects were in automobiles. Johnson & Bogolmony, *supra* note 29, at 538.

**39.** *See* United States Department of Justice, Uniform Crime Reports for the United States (1979). The nationwide rate of assaults on police officers during 1979 was 17 per 100 officers. *Id.* at 302. Firearms were used in 5.5% of the assaults. *Id.* at 303. Four hundred two of the assaults with firearms were made on policemen investigating suspicious persons or circumstances. *Id.* at 304. Nine officers were killed while conducting such investigations; 21 while making arrests for crimes other than burglaries and robberies. *Id.* at 309. Of the 106 officers slain in 1979, 100 (94%) were slain with firearms; 50% of those killed with firearms were within 5 feet of assailants when shot. *Id.* at 311. Of 1,604 persons identified in connection with officer killings from 1970–1979, 17% had prior narcotics arrests. *Id.* at 312.

Finally, the possibility always exists that a driver may try to start his car and drive off, thereby endangering the officer and members of the public. In this case, although the suspects' car was partially blocked by the police car so that it would have been difficult for them to drive off quickly, such an escape was possible. Moreover, the officer testified the suspects' car's ignition was on as he approached it. Tr. 37.

In *Mimms*, the Supreme Court decided that a motorist stopped for a minor traffic violation may be ordered out of his car even though the officer has no reason to believe he is either dangerous or armed.

> Establishing a face to face confrontation diminishes the possibility, otherwise substantial, that the driver can make unobserved movements; this, in turn reduces the likelihood that the officer will be the victim of an assault.
>
> The hazard of accidental injury from passing traffic to an officer standing on the driver's side of the vehicle may also be appreciable in some situations. Rather than conversing while standing exposed to moving traffic, the officer prudently may prefer to ask the driver of the vehicle to step out of the car and off onto the shoulder of the road where the inquiry may be pursued with greater safety to both.
>
> Against this important interest we are asked to weigh the intrusion into the driver's personal liberty occasioned not by the initial stop of the vehicle, which was admittedly justified, but by the order to get out of the car. We think this additional intrusion can only be described as *de minimis*. The driver is being asked to expose to view very little more of his person than is already exposed. The police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it. Not only is the insistence of the police on the latter choice not a "serious intrusion upon the sanctity of the person," but it hardly rises to the level of a "petty indignity." *Terry v. Ohio, supra* [392 U.S.], at 17 [88 S.Ct. at 1877]. What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety.

434 U.S. at 110–11, 98 S.Ct. at 333 (footnotes omitted).

The Court was careful to say, in response to a vigorous dissent by Justice Stevens, that "we do not hold today that 'whenever an officer has an occasion to speak with the driver of a vehicle, he may also order the driver out of the car.' " [40] We are asked here by appellant to distinguish *Mimms* because there the original stop was justified by probable cause to believe an actual violation of the law had taken place. We do not find such a distinction persuasive; the trial judge tapped a vein of common sense when he suggested that it defied logic to permit the policeman to order a minor traffic violator out of the car for the policeman's safety but not allow him to exercise the

---

40. There were dissents by Justices Marshall, Stevens and Brennan. Justice Marshall was concerned because the officer had no reason to suspect the motorist might have a gun, and there was no nexus between the reason for the stop, an expired license plate, and the order to step out of the car. *Id.* at 113–4, 98 S.Ct. at 334–5. Justice Stevens worried that license to order every traffic violator out of the car abandoned

> "the central teaching of this Court's Fourth Amendment jurisprudence"—which has ordinarily required individualized inquiry into the particular facts justifying every police intrusion—in favor of a general rule covering countless situations. But what is most disturbing is the fact that this important innovation is announced almost casually, in the course of explaining the summary reversal of a decision the Court should not even bother to review.

*Id.* at 116, 98 S.Ct. at 336 (footnote omitted). Justice Stevens also countered the statistics of officer killings during traffic stops and offered evidence that it may be safer to have the occupants remain in the car. *Id.* at 119, 98 S.Ct. at 337. He rejected the notion that the officer should not have to "explain the reasons for his actions" according to the circumstances of each case. *Id.* at 122, 98 S.Ct. at 339.

same precaution when making a valid *Terry* stop of suspected narcotics traffickers.[41]

Although the proper application of *Mimms* has been the subject of some confusion,[42] *see, e. g., Jones v. United States,* 391 A.2d 1188 (D.C.App.1978) (officer who saw car parked late at night in rear parking lot could approach car to investigate, but could not order occupants out of car even though he saw passenger make a quick movement as though to hide something), we do not find such an order here to be objectionable.[43] As Judge Leventhal so cogently put in in *Bailey*:

> the hard questions are in the middle, and can only be evaluated by looking, as in so many other Fourth Amendment questions, to the reasonableness of the police conduct.
>
> We are not dealing here with psychological gamesmanship staged in the backroom of the police station. As a society, we routinely expect police officers to risk their lives in apprehending dangerous people. We should not bicker if in bringing potentially dangerous situations under control they issue commands and take precautions which reasonable men are warranted in taking.

389 F.2d at 315–16.

The climax of this sixty second drama, according to Hill's testimony, came when, after ordering the occupants to get out four times,

> [t]hey moved—well, Mr. White, he moved. He looked at me and I said, "Get out of the car," and he was very reluctant to get out of the car. He kept moving around in his seat. He became very fidgety and moving around. I said, "Get out of the car," and I said—I think there came a time when I told him to put his hands on the dashboard and when he did that, I was going to come around and open the door. But when I did that, he dropped his hands back down in his waist area and at that point I said, "Get out of the car," and he just willingly refused to get out and he kept fumbling in the seat, going like this (demonstrating) and he brought his hand out and he dropped them back down.
>
> And when he brought his hands out that time, I backed away from the car and that's when I went—I believe I went around to the front of the car and as he was getting out of the car, I continued to back away because I didn't want to shoot him and I just backed away. I don't know why I was backing up because I didn't know what he had as he was getting out of the car.
>
> And as the door came open, tinfoil fell to the ground and he came around and he put his hands sort of in this position (demonstrating) and that's when I grabbed him from the rear.[44]

Tr. 38–39.

The "furtive gesture" scenario is not an altogether unfamiliar one in cases of this

**41.** In *Mimms* it was the allegedly indiscriminate and unparticularized license to order citizens out of the car without relation to the offense for which they had been stopped that appeared to bother the dissenters.

**42.** *See* Miles, *From Terry to Mimms, The Unacknowledged Erosion of Fourth Amendment Protections Surrounding Police-Confrontation,* 16 Am.Crim.L.Rev. 127 (1978).

**43.** We must, after all, take into account the very real danger the police officers faced when making this stop. *See DC Policeman Shot by Drug Suspect,* Washington Post, Feb. 12, 1980, at A1, col. 4 (policemen on anti-drug detail shot while making street arrest).

**44.** Hill also testified that prior to this point he had seen the passenger Nicky discard tinfoils,

which as an experienced narcotics officer he "had reason to believe ... contained possible narcotic substance," Tr. 12, and that White:

> ... kept fidgeting around and moving and I kept saying, "Get out of the car," and he placed—he kept his hands down. So after I observed him to *remove the tinfoil item from his pocket,* I kind of stepped back away from the car because I didn't know what it was at that particular point. I kept my gun trained on him, and at that point the door opened and as the door opened, the driver's side door opened, a tinfoil fell on to the street.

Tr. 12–13 (emphasis supplied).

The trial court subsequently rejected that portion of Hill's testimony that related to his ability to see White and Anderson removing tinfoil from around their waist area, Tr. 93, because, according to the trial court, he could

kind. Levels of force and intrusion in an "investigatory stop" may be legitimately escalated to meet supervening events, such as attempted flight, *e. g., United States v. Thompson*, 558 F.2d 522, 524 (9th Cir. 1977), *cert. denied sub nom. Reeve v. United States*, 435 U.S. 914, 98 S.Ct. 1466, 55 L.Ed.2d 504 (1978) (drawing of weapon justified after officers had identified themselves and ordered the vans to stop and one van started to move, then lurched forward); *United States v. Maslanka*, 501 F.2d 208, 213 (5th Cir. 1974), *cert. denied sub nom. Knight v. United States*, 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975) (reasonable for officer to approach car at gunpoint after five-mile, high-speed chase). Other kinds of suspicious behavior may lead an experienced officer to fear for his safety, thus justifying an escalation in the level of force used, *e. g., United States v. Bull*, 565 F.2d 869, 871 (4th Cir. 1977), *cert. denied*, 435 U.S. 946, 98 S.Ct. 1531, 55 L.Ed.2d 545 (1978) (suspects bent over when policeman approached as if to hide faces; one had on heavy jacket though it was a warm night; held reasonable to use gun, stop, and frisk suspects).

A "reasonable" reaction in this context, like "probable cause," turns on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). *See* Kamisar, *Is The Exclusionary Rule An 'Illogical' or 'Unnatural' Interpretation of the Fourth Amendment?*, 62 Judicature 66, 84 n.112 (1978). Judged by this standard, we do not hold Hill's actions in ordering the appellants to exit from the car at gunpoint to be unreasonable within the meaning of the Fourth Amendment.

If the *Terry* stop itself was validly originated, we cannot say that its escalation into an order at gunpoint directing the occupants to get out of the car was unreason-

able in light of the driver's hesitation and furtive hand movements.

### 3. Was This a Valid Terry Stop?

We have saved until last the most difficult part of the analysis, which focuses on the question of whether an investigatory stop, specifically one featuring the admittedly coercive elements of use of guns and orders to get out of the car, was justified in this case. The *Terry* threshold was described by this court in *Wylie* as follows:

> The general constraint set forth in *Terry* is that an investigative seizure must be "reasonably related in scope to the justification for [its] initiation." *Terry v. Ohio, supra*, 392 U.S. at 29, 88 S.Ct. 1868, 1884; *accord, United States v. Brignoni-Ponce, supra*, 422 U.S. at 881, 95 S.Ct. 2574 [at 2580]. And, in determining reasonableness, "the facts [must] be judged against an objective standard: would the facts available to the officer at the moment of seizure . . . 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry v. Ohio, supra*, 392 U.S. at 21–22 [88 S.Ct. at 1879–1880],

569 F.2d at 70. *See also United States v. Mendenhall*, 446 U.S. 544, 561, 100 S.Ct. 1870, 1881, 64 L.Ed.2d 497 (1980) (Powell, J., concurring) ("The reasonableness of a stop turns on the facts and circumstances of each case. In particular, the Court has emphasized (i) the public interest served by the seizure, (ii) the nature and scope of the intrusion, and (iii) the objective facts upon which the law enforcement officer relied in light of his knowledge and experience.")

In this case, to restate the facts, Detective Hill, a veteran of 12 years on the force, 11 of them on narcotics detail, with 1,000 arrests to his credit, Tr. 17, received an anonymous tip from an unknown informer. The tip, however, was quite specific as to the location and description, down to license

not see that area from his vantage point (by the left front fender, looking in the windshield). In fact, however, at trial both White's and Anderson's testimony corroborated that this is precisely what happened. When they heard the

police announce themselves, Anderson panicked and began tossing the tinfoil packets around the seat and floor of the car to get them out of sight. White in turn tried to brush them off of his person. Tr. 301, 326, 333.

tag numbers, of the two cars and as to the name, age and garb of one of the defendants. Moreover, it described a pattern of behavior on the suspects' part—"Nicky" would park his car, get into the other man's car, drive away, and return within a short period. Finally, the tip charged the defendants with a specific, serious, crime. The tipster alleged that they were narcotics traffickers.

As the Supreme Court made clear in *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), not all tips are created equal:

> Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability. One simple rule will not cover every situation. Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a subject would be authorized.

*Id.* at 147, 92 S.Ct. at 1923. In holding that the tip received in *Adams* warranted the challenged stop for questioning of a driver in a car, the Court stressed that the informant was known to the officer personally and had provided him with information in the past, and he came forward in person to give the information, and that under the applicable law, he would have been subject to immediate arrest for making a false complaint had the officer's investigation proved the tip incorrect. *Id.* at 146–147, 92 S.Ct. at 1923. The Court explicitly distinguished the *Adams* situation from that of "an anonymous telephone tip," *id.* at 146, 92 S.Ct. at 1923, like the one involved here.

Some commentators urge, and some courts have held, that anonymous tips do not justify *any* investigative stops, citing the spectre of indiscriminate harassment of

innocent citizens as a result of tips from disgruntled neighbors of mischief-makers.[45]

Most federal appellate courts, however, have rejected this absolute rule in favor of an individualized analysis of the credibility of the tip. When that credibility is enhanced by the responding officer's observation of corroborating details an anonymous tip may provide a legitimate basis for a stop, and in some cases, an arrest. The difficult question is how much corroboration is necessary to justify an intrusion of the suspect's Fourth Amendment rights.

■ When the officers' own observations tend to confirm parts of the tip that relate to illegal activity, the anonymous tip is "boost[ed] . . . over the probable cause threshold," justifying an arrest. *United States v. Smith*, 598 F.2d 936 (5th Cir. 1979). At that point, the two prongs of the test derived from *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), are satisfied: "The 'credibility' prong—is the information believable?," and the "criminal conduct prong,"—"The tip must contain a sufficient statement of the underlying circumstances from which the informer drew his conclusion that the suspect was engaged in criminal conduct." *United States v. Smith*, 598 F.2d 936, 938 (5th Cir. 1979). However, "the matter becomes more difficult when the corroborated facts concern activity wholly innocent." *Id.* The court in *Smith* held that mere corroboration of innocent details[46] was not sufficient to boost the anonymous tips in that case, two anonymous letters warning of impending drug transactions, over the probable cause threshold. *But see id.* at 940–42 (Hill, J., dissenting); *United States v. Tuley*, 546 F.2d 1264, 1268 (5th Cir.), *cert. denied*, 434 U.S. 837, 98 S.Ct. 128, 54 L.Ed.2d 99 (1977) (accumulation of innocent detail conform-

---

**45.** *See* LaFave, *"Street Encounters" and the Constitution: Terry, Sibron, Peters, and Beyond*, 67 Mich.L.Rev. 39, 77–8 (1968) (anonymous tips too unreliable and too susceptible of fabrication to justify investigative stops). Some district courts have accepted this analysis. *See United States v. Calovich*, 392 F.Supp. 52, 58 (W.D.Mo.1975); *United States v. Pearce*,

356 F.Supp. 756, 759–60 (E.D.Pa.1973), *vacated and remanded per memo*, 3 Cir., 566 F.2d 1170 (1970).

**46.** The corroborated details included the driver's identification, the car's make, model, color, and license numbers, and its appearance at a particular border checkpoint.

ing to original tip coupled with exigent circumstances gave rise to probable cause); *United States v. Brennan*, 538 F.2d 711, 720–21 (5th Cir. 1976), *cert. denied*, 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977) (though "the better practice is to obtain corroboration of incriminating details, . . . quantum of knowledge [of] equivocal information ripened into probable cause"). *Cf. Spinelli v. United States*, 393 U.S. 410, 417, 89 S.Ct. 584, 589, 21 L.Ed.2d 637 (1969) (tip may provide "such detail, [that a magistrate] could reasonably infer that the informant had gained his information in a reliable way").

■ However, only "reasonable suspicion," not probable cause, is necessary to justify a *Terry* stop. Reasonable suspicion requires a lower quantum of proof than does probable cause. *United States v. Afanador*, 567 F.2d 1325, 1329 (5th Cir. 1978); *United States v. Gorin*, 564 F.2d 159, 161 (4th Cir. 1977), *cert. denied*, 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978). Accordingly, courts have been more willing to allow stops justified only by anonymous tips corroborated by observation of innocent details than arrests based on similar information. In *United States v. Andrews*, 600 F.2d 563 (6th Cir.), *cert. denied sub nom. Brooks v. United States*, 444 U.S. 878, 100 S.Ct. 166, 62 L.Ed.2d 108 (1979), the court upheld an investigative stop of a drug suspect in an airport though the sole basis for the stop was the corroboration of innocent details of an anonymous tip: the suspect's name and description and the flight on which he was arriving. The court placed great emphasis on the fact that the tip alleged the drugs would be delivered to a known drug dealer; however, the dealer was nowhere in sight at the time of the stop.

The Ninth Circuit has similarly sustained the validity of a stop based on an anonymous tip corroborated only by observation of innocent details. In *United States v. Sierra-Hernandez*, 581 F.2d 760 (9th Cir.), *cert. denied*, 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978), an unidentified man drove up to a border patrol agent and told him that a truck, which he then described, was proceeding on a nearby road and had just "loaded up with weed at the canebreak." The officer; who knew the canebreak had been the site of previous instances of drug and alien smuggling, immediately went after, and found, the described truck. A voluntary search yielded a cache of drugs. The court upheld the stop after applying the following standard:

> But just as there is no per se rule establishing the reliability of a citizen's tip to justify a stop in every instance, so too there is no per se rule requiring an officer to obtain the identity of the informant before he acts. In evaluating the reasonableness of the officer's conduct in this case, we therefore must consider both the circumstances in which the tip was made and the facts which would justify the officer in acting without knowing the citizen's identity or obtaining information for tracing him later.

*Id.* at 763. *See also United States v. Jones*, 599 F.2d 1058 (9th Cir. 1979) (anonymous tip about stolen wood accurate as to time, description of truck, location of delivery and nature of activity sufficient basis for stop); *United States v. Gorin*, 564 F.2d 159 (4th Cir. 1977), *cert. denied*, 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978) (anonymous telephone tip describing armed man sitting at a bar, corroborated in part by the bartender, held to justify stop of a man meeting that description several blocks away).[47]

---

47. In *United States v. Ramos-Zaragosa*, 516 F.2d 141 (9th Cir. 1975), cited by dissent, the court suppressed a sack of heroin found underneath the front seat of a car stopped on the road by officers who pointed a gun at the occupants through the police car window and told them to put up their hands, all on the basis of an anonymous tip which the court found "considerably less precise than was the de-scription of the accused in *Draper* [*v. U.S.*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327]." The court twice called it a "close question," carefully limited its holding to "all . . . the circumstances" of that case, and lamented the "poorly marked boundaries" of the law of the subject. 516 F.2d at 145. Moreover, the court held the stop an arrest—"the agents at gun point, under circumstances not suggesting fears for their

The number and variety of anonymous tip cases is endless. None are directly on point; each can be distinguished. The question whether an anonymous tip corroborated only by observation of innocent details justifies a *Terry* stop is a live and disputed one. Indeed, earlier this year three members of the Supreme Court, recognizing division among the circuits on this issue, called for Supreme Court resolution of it in *Jernigan v. Louisiana*, 446 U.S. 958, 100 S.Ct. 2930, 64 L.Ed.2d 816 (1980) (White, J., dissenting, with whom Brennan, J. and Marshall, J., concur) (denial of certiorari):

> We have not directly decided whether an anonymous tip may furnish reasonable suspicion for a stop and frisk. We have emphasized the specificity of the information provided, the independent corroboration by the police officer, and the danger to the public. See, e. g., *Adams*, supra; *Draper v. United States*, 358 U.S. 307 [79 S.Ct. 329, 3 L.Ed.2d 327] (1959). But in the decided cases, these factors were not the only indicia of reliability. The informers in *Adams* and *Draper* were known to the officer and were known to have provided reliable information in the past. The same cannot be said of an anonymous tipster.
>
> Arguably, the decision of the Louisiana Supreme Court is inconsistent with our prior cases which require that reasonable suspicion be based on a sufficiently reliable informer's tip. I would grant certiorari for this reason and also because the reliability of an anonymous or unidentified tipster is an issue that has divided the federal courts of appeals. Compare *United States v. McLeroy*, 584 F.2d 746

(CA5 1978), and *United States v. Robinson*, 536 F.2d 1298 (CA9 1976) (no reasonable suspicion), with *United States v. Hernandez*, 486 F.2d 614 (CA7 1973) (*per curiam*) (reasonable suspicion), cert. denied, 415 U.S. 959 [94 S.Ct. 1488, 39 L.Ed.2d 574] (1974). See also *United States v. Gorin*, 564 F.2d 159 (CA4 1977), cert. denied, 434 U.S. 1080 [98 S.Ct. 1276, 55 L.Ed.2d 788] (1978), and *United States v. Unverzagt*, 424 F.2d 396 (CA8 1970) (identity of informer known but no proof of his reliability; reasonable suspicion found). The state courts are similarly divided.

█ Based on the particular facts of this case, we conclude that an anonymous tip about an ongoing transaction, detailed as to time and place, including a specific description of one of the participants and their vehicles as well as their modus operandi, and verified by the officers through surveillance in all details except for the actual possession or exchange of narcotics provides a sufficient basis for a legitimate *Terry* stop to question the occupants as to their identity and visually check inside the car. Where necessary, this approach to the car may be enforced—as it was here—by an order to the occupants to get out of the car.[48]

We are well aware that in rendering even so careful a holding we are on the outermost perimeters of the *Terry* doctrine. We do so nonetheless for the following reasons:

1. It is well-recognized that citizen informants in narcotic-ridden neighborhoods want to retain anonymity for fear of retaliation from traffickers.[49] However, the pe-

---

personal safety, ordered the appellant and his passenger to stop and put up their hands," *id.* at 144. Thus the question was whether the tip supplied "probable cause," not "reasonable suspicion," which is all that is required in the instant case.

Finally, we would point out that under current case law, often a very thin—almost non-existent—line realistically separates anonymous from "reliable" tipsters. In *United States v. Tuley, supra,* for instance, the court accepted as "reliable" an unnamed informant whom a DEA officer merely alleged, without giving any

details, to be a "credible source." *See* 546 F.2d at 1271 (Godbold, J., dissenting).

**48.** The right to stop does not include any right to frisk unless there is a particularized reason to believe the occupants are carrying weapons. It also does not include the right to search the car other than to look inside for objects "in plain view."

**49.** *See* McDonald, *Enforcement of Narcotic and Dangerous Drug Laws in the District of Columbia, in* Appendix, Drug Abuse in America, Second Report of the National Advisory Com-

culiar nature of narcotics crimes means that arrests are almost totally dependent on tips and undercover work; there are no reporting "victims."[50] Therefore, enforcement officials actively encourage such tips from citizens who deplore the effects of drug traffic on their children and their neighborhood. If we are serious about enforcing drug trafficking laws, police must have the ability to reasonably follow-up such anonymous tips through investigation.

2. This was a tip about a narcotics transaction in progress;[51] the tipster said Nicky and the driver would have narcotics with them when they returned in the Oldsmobile. It was also precise as to the descriptions of the two cars involved, the identity and dress of Nicky, and the timing of the return. It was therefore reasonable to surmise that the informant must have (1) seen Nicky leave with the driver and (2) known enough about the pattern of his actions to predict the time of his return and what he would be doing in the interim. *Cf. Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). There is little doubt that if the informant had a "track record" so as to be deemed "reliable" or had detailed how he knew about Nicky's activities, the tip would meet the "reasonable suspicion" test required for a *Terry* stop, if indeed it did not establish the probable cause necessary for an arrest.[52]

Even without these indices of reliability, however, we are unwilling to say that tips

mission on Marihuana and Drug Abuse 668 (1973): "At higher levels, the stakes are substantially increased and there is evidence of active efforts by drug traffickers to learn the identity of informants."

**50.** *See* Drug Abuse Council, The Facts about Drug Abuse 69 (1980):

> In drug cases, police usually do not have victims on whom to rely. Not only are there no complainants, but everyone involved conspires to conceal the crime from the police. As a result most illicit drug offenses go entirely undetected; the percentage of violations which result in arrest are extremely low.

and National Commission on Marihuana and Drug Abuse, Drug Use in America: Problem in Perspective, 229 (1973):

> Because a drug dealer and his user-victim share a community of interest, drug trafficking offenses are highly resistant to traditional law enforcement techniques.

**51.** Experienced drug squad officers like those involved here apparently learn to discriminate among even anonymous calls. The best ones to follow up are those about transactions in progress. *McDonald, supra* note 49, at 620:

> About 20 calls a day come from citizens ... [Narcotic] Branch officers prefer to avoid investigating citizen complaints. They will assure the complainant that something will be done; and in fact, it will. All the information will be taken down and the complainant will be told to call back if he hears or sees anything further. The branch officers treat the information as useful—especially when it includes names and addresses—but they rarely follow such complaints up because the information is usually not enough to establish probable cause to search or arrest. The citizen may just "suspect something funny" is going on.

> On the other hand, investigators will usually respond to a report that X is at this moment selling heroin on the corner of Y and Z streets. In this kind of situation, there is a good chance that they will be able to see a transaction.

**52.** *See United States v. Sanders*, 631 F.2d 1309 (8th Cir. 1980). In this case DEA agents received a tip from a reliable informant about some narcotics couriers. The agents waited in their car until the suspects entered into their car. Without seeing anything more, the agents drove their vehicle in front of suspects' car. As an agent approached the car, announcing his identity, he noticed one man make a furtive gesture from his shirt pocket to floor. The court found both reasonable suspicion for a *Terry* stop and probable cause for arrest existed at that point.

> Agents Thornton and Overbaugh had probable cause to arrest Sanders and Biggles. A reliable informant had provided information, giving the agents a reasonable suspicion that the meeting between Sanders and Biggles involved distribution of narcotics. Their personal observation of the meeting partially corroborated the information provided by the confidential informant. Effective law enforcement required them to follow up on this suspicion. As the agents approached Sanders and Biggles, the furtive movement of Biggles and his contemporaneous facial expression further corroborated the information provided by the informant, and the totality of information then known to the agents served to establish probable cause to make an arrest. *See Draper v. United States*, 358 U.S. 307 [79 S.Ct. 329, 3 L.Ed.2d 327] (1959). *Id.* at 1312–13 (footnote omitted).

as detailed as this one, and which prove to be accurate in all the "innocent" details, must be ignored. If they are not to be ignored, an investigative stop seems the only alternative. Short of such a stop, the police can only sit, wait, and hope they will see from afar some suspicious conduct inside the suspects' car (not a likely possibility), or else follow one or both of the suspects when they drive on or leave the car, thereby risking the loss of their trail in traffic or in darkness. The fact they were in a car which could move off created a need for reasonably quick action to preserve some legacy of the verified tip and observation. *Compare Sibron v. New York*, 392 U.S. 40, 73, 88 S.Ct. 1889, 1907, 20 L.Ed.2d 917 (1968) (Harlan, J., concurring) ("one important factor . . . in determining whether there are reasonable grounds for a forcible intrusion is whether there is any need for immediate action"; no need found) *with United States v. Oates*, 560 F.2d 45, 59 (2d Cir. 1977) (need for stop supplied by inherent odiousness of offense, and need for quick and decisive action when large-scale dope peddlers are about to board a jet aircraft).

In an antiseptic world, the officers might, of course, have simply walked up to the car and politely asked if the occupants would mind identifying themselves. Such "contact" implies that the citizen can refuse to cooperate, i. e. drive away, and generally is not considered to rise even to the level of a *Terry* stop. Since it is not read as a "seizure," presumably it need not be justified by a "reasonable suspicion" that a crime is taking place based on articulable facts. *See, e. g., United States v. Elmore*, 595 F.2d 1036 (5th Cir. 1979), *cert. denied*, 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980) (asking for identity of man who made "strange moves around airport" was not *Terry* stop so as to require justifiable suspicion); *United States v. Wylie*, 569 F.2d 62 (D.C.Cir.1977), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978) (no seizure occurred during on the street questioning).

But we do not live in an antiseptic world. And in our tarnished one, to limit an officer to the kind of voluntary "contact" he can make walking any beat reduces the tip and verifying observations to a nullity. Unless the officer has the authority to enforce the stop—for the limited purpose of obtaining identities and looking into the car—he has no intermediate response between a "contact" and an arrest. We do not find anything in *Terry* or its underlying rationale to require that the articulable facts and inferences upon which reasonable suspicion may rest can never be grounded in an anonymous tip, where an array of noncriminal details have been corroborated by the officers' own observations and where the suspects are in a position to move away. While recognizing that the precise question has not been before us previously, in the circumstances of this case, we find the police stop reasonable.

### 4. *Fourth Amendment Implications of Our Decision*

We need no reminder of the Court's profound responsibilities to uphold Fourth Amendment rights against unreasonable seizures. Nonetheless, where there is a verified, though anonymous, detailed tip about narcotics trafficking, we do not find inherently unreasonable an intrusion consisting of a demand to step out of a car, enforced ultimately through leveling the officer's gun against recalcitrant subjects who not only do not respond but make suspicious movements inside the car. No search of a person or car was conducted here before probable cause had been established by the observed presence of narcotics; the only bodily contact up to that point was the officer's physical escort of "Nicky" to the front of the car. The police officers made a reasonable attempt to investigate a detailed, credible tip about a serious crime that would at most have involved temporary inconvenience to the occupants of a parked car, had they been entirely innocent.[53] These are the facts of the

---

53. Immediately prior to issuance of this decision, the Supreme Court held in *United States*

*v. Cortez*, —— U.S. ——, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), that border patrol agents

case;[54] other fact situations may produce different results. The judgment is

*Affirmed.*

EDWARDS, Circuit Judge, dissenting:

Pared to its essential facts, this case involves two police officers who, *acting solely on an anonymous tip,* blocked the appellants' car, approached the appellants with guns drawn, and ordered them out of their automobile at gunpoint. The police officers acted without probable cause; they acted without having observed any suspicious circumstances; and they acted without having any reliable information about the appellants, who were unknown to them. The police officers never had specific reasons to fear for their safety: they observed nothing that would indicate potential violence; the tipster had said nothing about weapons; the appellants were not suspected of committing any violent crime; the appellants were in plain view of the officers at all times; and the appellants never attempted to flee. Despite this, the officers asked no questions of the appellants before ordering them to get out of their car at gunpoint.

This case arose in the inner-city of Washington, D. C. One wonders whether police officers, *acting on an anonymous tip,* would accost well-to-do residents in one of the affluent suburbs near Washington (where drug peddling is known to be prevalent), in the same manner that they accosted the appellants here. It is doubtful.[1]

could stop a vehicle to question its occupants "about their citizenship and immigration status and the reasons for the round trip in a short time span in a virtually deserted area," *id.* at ——, 101 S.Ct. at 697, without direct observation of or even information about any ongoing criminal activity involving the specific individuals or car stopped. Rather, the agents had stopped the vehicle because its movement was consistent with the *modus operandi* of "Chevron"— a hitherto anonymous smuggler of illegal aliens. In deciding whether the "articulable reasons" necessary to justify the stop existed, the Court stressed that "the totality of the circumstances—the whole picture—must be taken into account." *Id.* at ——, 101 S.Ct. at 695. Among the circumstances to be considered, the Court mentioned "information from police reports ... and consideration of the modes or patterns of operation of certain kinds of lawbreakers"; it noted perceptively that "[f]rom these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person." *Id.* The Court concluded by emphasizing "the imperative of recognizing that, when used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person—and for action on that suspicion." *Id.* at ——, 101 S.Ct. at 695.

**54.** We do not believe the dissent characterizes our opinion fairly. Surely it does not stand for the flat proposition that a citizen can be "forced out of a car at gun point, grabbed from behind, and 'placed on the hood of a vehicle'" when the stop is "based entirely on an anonymous tip," Diss. Op. at 59, 60, nor that "the police are now free to detain forcibly—at gun point—individuals on the basis of an anon-

ymous tip and without observing any suspicious activity, for crimes that do not involve an immediate danger to the public-at-large or police officers." Diss. Op. at 59. White was not grabbed or placed on the hood for frisking until after the incriminating tinfoils fell out of the car, at which point even appellants concede probable cause for an arrest existed. Anderson was ordered out of the car at gunpoint and escorted to its front only after Hill had seen White make the fidgeting gesture. Up to the point where narcotics were in "plain view" the police had done no more than order appellants out of the car for questioning and take Anderson around to the front of the car. The dissent also omits any mention of the fact that the suspects, not the police, provoked the escalation in the use of force. The officers did not raise their guns until after the appellants had refused several requests to exit the car and Hill observed White make furtive hand movements. Thus, by the time the officers ordered appellants out of the car at gunpoint, they were not acting merely on an anonymous tip and observations; they were reacting at least in part to appellants' own suspicious behavior.

**1.** The majority opinion seems to assume that "the plight of the 'inner city' resident" is somehow different from that of the suburban resident living in areas where drug peddling is prevalent. *Ante* at 36 n.34. The basis for this assumption is difficult to comprehend. Although the Washington Post article is an interesting statement about the problem of drugs in the city, it certainly does not suggest that the problem is unique to the city. Most importantly, the Constitution cannot be read to have a suburban gloss, resulting in inferior constitutional protections for inner city residents.

There are admittedly a host of conflicting judicial precedents among the various courts of appeals dealing with "search and seizure," "arrest," and "stop and frisk." Nevertheless, this is not a "close case," as the majority suggests, if one focuses on the applicable constitutional guarantee and carefully considers the Supreme Court decisions construing the Fourth Amendment. As the Supreme Court noted in *Terry v. Ohio*, 392 U.S. 1, 15, 88 S.Ct. 1868, 1876, 20 L.Ed.2d 889 (1968), the

> courts still retain their traditional responsibility to guard against police conduct which is overbearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires. When such conduct is identified, it must be condemned by the judiciary and its fruits must be excluded from evidence in criminal trials.

In my view, this case presents a situation of police conduct that "must be condemned" as violative of fundamental civil liberties guaranteed by the Fourth Amendment.

While it is true, as the majority opinion notes, that we do not live in an "antiseptic world," we do live in a nation governed by certain inviolate constitutional principles. The application of these principles may not always admit of easy solutions; nevertheless, this should not justify a diminution of individual rights guaranteed by the Constitution.

The core claim in this case is that, based only on an anonymous tip, basic civil liberties have been sacrificed at the hands of coercive police behavior. At stake is the interest of the individual to be free from "unreasonable" governmental seizures. This is not a case involving any significant interest of the Government in seeing that the police carry out their official duties effectively and safely. The police officers had an opportunity to place the appellants under surveillance. There was no threat of imminent danger, and there was no threat that appellants might flee; the seizure was unreasonable because there was insufficient justification for it.

It might be argued that this is a case where the convenience of governmental operations conflicts with basic civil liberties. However, since it does not seem possible to accommodate each side, I am firmly convinced that we must decide the case in favor of individual liberty. Accordingly, I dissent.

## I. THE FACTS

Although the majority opinion sets out the pertinent facts in this case, a brief recitation of them is necessary to highlight my principal Fourth Amendment concerns, and to clarify some potentially misleading statements made in the majority opinion.

In the early evening of September 11, 1979, Detective Hill received an anonymous telephone tip describing with some detail an individual called "Nicky." The tipster described a Ford LTD that Nicky had parked, and a different car (an Oldsmobile) that he had driven away. The tipster told the detective that "when they came back [in the Oldsmobile], they would have drugs on [sic] their possession." Tr. 6.[2]

The detective did not know the tipster, and the tipster "was not an informant who had previously given ... information which had proven reliable." Tr. 32. Furthermore, the source did not reveal to the detective how he had acquired his information, and the detective did not ask. *Id.* At no time did the source, who had given a detailed description of Nicky and the two cars, suggest that Nicky, or any other occupants of the car, would be armed.

Detective Hill and his partner, Detective Sanchez-Serrano, drove to the place where Nicky was to return with the drugs. At approximately 7:45 p. m. the Oldsmobile drove up. Detective Hill recognized neither the Oldsmobile nor its occupants from his previous investigative work. Tr. 34–35. The detectives observed no suspicious circumstances, and could point to no factors that would lead them to fear for their safety in this case.

---

2.  "Tr." refers to the transcript of the hearing of the motion to suppress evidence.

After the Oldsmobile parked, the detectives drove alongside. Sanchez-Serrano got out and approached the passenger side of the Oldsmobile. Hill drove a few feet further and got out, approaching the driver's side.

The detectives did not look inside the car or question its occupants. Instead, Hill issued a series of commands, ordering the occupants, White and Anderson, to keep their hands in plain sight and to get out of the car immediately. Up to this point the officers noticed no suspicious circumstances. Although Hill testified that he spoke in a moderate tone, Tr. 41, his partner testified that Hill "yelled" the orders. Tr. 53.

Hill had his service revolver drawn and trained on the driver, White, when he ordered him to "get out of the vehicle."[3] When White finally got out of the car, a "tinfoil" fell from the car to the ground. Tr. 13.[4] Sanchez-Serrano also approached the car with his revolver drawn. When the passenger, Anderson, got out of the car, the detective took him to the front of the car and "placed [him] on the hood of the vehicle." Tr. 54. Up to this point, Sanchez-Serrano had not seen any evidence of illegal activity.

After White was out of the car, Hill grabbed White by the back of his pants and returned his gun to his holster. He picked up the tinfoil and, believing that it contained narcotics, formally placed White under arrest, handcuffing him. Tr. 13. While Sanchez-Serrano watched the two appellants, Hill searched the car and found additional tinfoils inside. After handcuffing White, Hill searched him, finding more tinfoils but no weapons. Anderson also was unarmed.

During the suppression hearing, Hill testified that he was concerned that the appellants might be armed. Tr. 17. This concern was based not on facts specifically related to this case, but on his twelve years experience as an officer, during which he had made over a thousand arrests in which "a substantial number of those situations, the people [he] arrested were armed, or [he] had reason to be concerned about [his] safety." Id.[5]

## II. SUPREME COURT DECISIONS DEFINING THE "STOP AND FRISK" DOCTRINE

As the majority opinion recognizes, appellants White and Anderson were "seized" by the police well before they were formally placed under arrest at the hood of the car. Assuming that probable cause for arrest existed after Detective Hill examined the tinfoil that fell from the car, the issue for

---

**3.** The Government recognizes that "[a]lthough the record is not completely clear concerning the exact point at which Detective Hill drew his revolver . . . it is clear that he had it out before the car doors were opened." Brief for Appellee United States at 4 n.3.

**4.** Detective Hill also testified that he saw both Anderson and White remove a tinfoil from their pockets before they got out of the car. Detective Sanchez-Serrano saw nothing of this sort. Tr. 63. The trial court specifically rejected Hill's testimony that he saw narcotics while the appellants were still in the car. Tr. 93.

Because the judge rejected this testimony, and the majority does not expressly find the trial court's finding clearly erroneous, the majority's discourse on Hill's testimony at trial concerning what he saw in the car is completely irrelevant. See ante at 39–40 n.44. Our review of the trial court's denial of the motion to suppress must be based only on the evidence presented at the suppression hearing and not on the evidence presented at trial. While the majority seems to acknowledge formally this limitation on the scope of our review, its apparent regret over not being able to use Hill's trial testimony is disturbing. One hopes that the majority's decision in this case was not influenced by record material not properly reviewable by this court.

**5.** In an apparent attempt to bolster its conclusion that the police acted reasonably in drawing their guns, the majority identifies the neighborhood where the arrest took place as a "high crime area." See ante at 36 n.34. There is absolutely no evidence in the transcript of the suppression hearing to support such a statement. The majority's use of trial testimony in this matter, as with Hill's trial testimony as to what the detective saw in the car, see note 4, supra, is simply not permissible in reviewing the trial judge's denial in this case. Consequently, I proceed on the basis of the suppression hearing transcript, which provides no evidence that the appellants were arrested in a high crime area.

this court is whether any seizure that took place before that moment offended the Constitution. The questions before the court are whether the initial detention amounted to an arrest without probable cause, and if not, whether it nonetheless constituted an "unreasonable seizure."

The starting point for any discussion of an unconstitutional detention must be the Fourth Amendment, which provides in part that "the right of the people to be secure in their persons, ... against unreasonable ... seizures, shall not be violated."[6] Because the amendment does not use the word "arrest," but refers to "seizures," any discussion of arrest and lesser seizures derives entirely from the case law. Consequently, a brief review of the Supreme Court's holdings on "seizures" is useful to set out a doctrinal framework.

The seminal Supreme Court case discussing seizures, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),[7] dealt with "the role of the Fourth Amendment in the confrontation on the street between the citizen and the policeman investigating suspicious circumstances." *Id.* at 4, 88 S.Ct. at 1871. In *Terry* a detective observed three men apparently "casing" a store for a robbery. The detective approached the men, identified himself, asked for their names and, fearing that the would-be robbers may have had guns, patted their outer clothing for weapons. The detective discovered that two of the three men were carrying guns.

The Supreme Court affirmed the petitioner's conviction for carrying a concealed weapon. The Court reasoned that since the Fourth Amendment does not forbid all searches and seizures, but only unreasonable ones, the issue is "whether in all the circumstances of this on-the-street encounter, [the petitioner's] right to personal security was violated by an unreasonable search and seizure." *Id.* at 9, 88 S.Ct. at 1873.

The reasoning in *Terry* made clear that a "stop and frisk" is a "seizure" and is thus governed by the Fourth Amendment. "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Id.* at 16, 88 S.Ct. at 1877. However, the Court made clear that a seizure occurs only when some police coercion is used: "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* at 19 n.16, 88 S.Ct. at 1879 n.16.[8]

The Court held that the weapons search, which of necessity involved a seizure of the petitioner, was legitimate so long as the "officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others." *Id.* at 24, 88 S.Ct. at 1881. The officer's belief would be justified only if "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.... And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts

---

6. U.S.Const. amend. IV.

7. Before *Terry*, the term "arrest" was generally equated with the term "seizure." The standard to test the legality of a seizure was probable cause, and no lesser standard was permitted. *See generally Dunaway v. New York*, 442 U.S. 200, 208, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1979). In light of subsequent legal developments beginning with *Terry*, however, little reliance can be placed on these early pronouncements.

8. As this court noted in *United States v. Wylie*, 569 F.2d 62, 67 (D.C.Cir.1977), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978):

But police-citizen communications which take place under circumstances in which the citizen's "freedom to walk away" is not limited by anything other than his desire to cooperate do not amount to "seizures" of the person, and consequently may be initiated without a reasonable, articulable suspicion, much less probable cause.

in light of his experience." *Id.* at 27, 88 S.Ct. at 1883 (footnote and citations omitted). At another point, the Court in *Terry* stated that the "officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1879 (footnote omitted).

As a later case noted, *Terry* departed from traditional Fourth Amendment analysis in two respects. First, *Terry* "defined a special category of Fourth Amendment 'seizures' so substantially less intrusive than arrests that the general rule requiring probable cause to make Fourth Amendment 'seizures' reasonable could be replaced by a balancing test." *Dunaway v. New York,* 442 U.S. 208, 210, 99 S.Ct. 2248, 2255, 60 L.Ed.2d 824 (1979). Second, the Court approved "this narrowly defined less intrusive seizure on grounds less rigorous than probable cause, but only for the purpose of a pat-down for weapons." *Id.*

In a companion case to *Terry, Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), the Court applied the new "stop and frisk" rule. In *Sibron* an officer watched the appellant as he spoke with several narcotics addicts in a restaurant.[9] The officer approached Sibron and asked him to step outside, telling Sibron "you know what I'm after." Sibron mumbled something in reply and reached into his pocket. The officer also reached into Sibron's pocket, discovering several packets of heroin.

The Court reversed Sibron's conviction for unlawful possession of heroin on the basis of the newly announced *Terry* rule: "If Patrolman Martin lacked probable cause for an arrest, however, his seizure and search of Sibron might still have been justified at the outset if he had reasonable grounds to believe that Sibron was armed and dangerous." *Id.* at 63, 88 S.Ct. at 1903.

Holding that the officer never had reasonable grounds to believe Sibron to be armed,[10] the Court found it unnecessary to decide at what point a seizure had taken place—*i. e.,* whether at the request to go outside or during the search of the appellant's pocket.

The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so.

*Id.* at 64, 88 S.Ct. at 1903.

The Supreme Court elaborated on the *Terry* stop and frisk rule in *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). In that case, a person approached a police officer he knew and told the officer that the petitioner, who was seated in a nearby car, was carrying drugs and had a gun in his waistband. The officer approached the petitioner's car and asked him to open the door. When the petitioner rolled down the window, the officer reached inside the car and removed a gun from petitioner's waistband. The officer then arrested the petitioner for unlawful possession of a gun.

In discussing the meaning of *Terry,* the Court stated that a "brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Id.* at 146, 92 S.Ct. at 1923. Furthermore, "the policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect." *Id.* Thus, the Court identified two legitimate purposes behind a forcible stop, short of an arrest: to "maintain the status quo" and to protect the officer during the brief investigation. Nothing in

---

9. *Sibron* was actually two cases consolidated for argument. In this dissent we discuss only the first one.

10. In fact, the Court noted at one point that "the officer [did not] ever seriously suggest

that he was in fear of bodily harm and that he searched Sibron in self-protection to find weapons." *Id.* at 46, 88 S.Ct. at 1894 (footnote omitted).

*Adams* permits even a brief search except a need, based on articulable facts, to protect the officer.

The Court in *Adams* affirmed the petitioner's conviction, finding that the officer had acted reasonably. First, the "informant was known to him personally and had provided him with information in the past. *This is a stronger case than obtains in the case of an anonymous telephone tip.*" *Id.* (emphasis added).[11] Second, the "informant here came forward personally to give information that was immediately verifiable at the scene." *Id.*[12] The Court explicitly distinguished tips "completely lacking in indicia of reliability" from reliable ones—"for example, when the victim of a street crime seeks immediate police aid and gives a description of his assailant, or when a credible informant warns of a specific impending crime." *Id.* at 147, 92 S.Ct. at 1923.[13] When the petitioner rolled down his window instead of stepping out of his car, the threat of the gun was even greater, and the policeman's "limited intrusion designed to insure his safety . . . was reasonable." *Id.* at 148, 92 S.Ct. at 1924.[14]

*United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), involved a "pure" stop—that is, a seizure not involving a protective search like the one in *Terry*. In that case, federal Border Patrol officers stopped a car sixty-five miles from the Mexican border because the occupants of the car looked like Mexican nationals. The officers asked the occupants to indentify themselves and to justify their presence in this country. After discovering that some of the occupants were Mexican nationals not legally in this country, the officers arrested the occupants of the car.

The Supreme Court struck down the driver's conviction for violations of the Immigration and Nationality Act, holding that the officers did not have sufficient grounds to stop the car in the first place. The Court reaffirmed the principles set forth in *Terry*, stating that whenever " 'a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person' . . . and the Fourth Amendment requires that the seizure be 'reasonable.' " *Id.* at 878, 95 S.Ct. at 2578, quoting *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968).[15] The test of reasonableness depended on a balancing of the public interest and "the interference with individual liberty that results when an officer stops an automobile and questions its occupants." *Id.* at 879, 95 S.Ct. at 2579. Although the Court found this intrusion to be "modest," such a stop was permissible "only

11. These two factors make *Adams* readily distinguishable from the present case, which involved an anonymous phone call.

12. The Court found this fact significant since, under Connecticut law, the informant would have been subject to arrest for knowingly giving a false report. In the present case, the anonymous tipster was in no such danger, thus leaving the present tip without the extra quantum of credibility found in *Adams*.

13. Thus, the present case seems to fall somewhere between these two extremes. Other facts relevant to the *Adams* case, and which distinguish the present one, include that the petitioner was reported to be carrying a concealed weapon, and was seated in a high crime area at 2:15 a. m. On this basis, the police officer "had ample reason to fear for his safety." *Id.* at 148, 92 S.Ct. at 1924 (footnote omitted). In the present case there is no evidence that the appellants were armed or that the area was a "high crime area." *See* note 5, *supra*.

14. One lesson that can be drawn from *Adams* is that an occupant of a vehicle, like a pedestrian, may be subject to a stop and frisk. In *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660 (1979), the Court made this point explicitly: "stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth and Fourteenth] Amendments, even though the purpose of the stop is limited and the resulting detention quite brief."

15. Thus, even though the police action may be for the narrowest of purposes, it may amount to a seizure. In *Brown v. Texas*, 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979), the Court wrote that "[w]hen the officers detained appellant for the purpose of requiring him to identify himself, they performed a seizure of his person subject to the requirements of the Fourth Amendment."

if [the officers] are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *Id.* at 884, 95 S.Ct. at 2581 (footnote omitted).[16] In short, such a stop—even absent the search for a weapon—can be made only if the *Terry* standards are met. As the Court noted in *Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979), absent a reasonably warranted suspicion of criminal activity, "the balance between the public interest and [the individual's] right to personal security and privacy tilts in favor of freedom from police interference."

Two conclusions can be drawn from *Brignoni-Ponce*. First, the police can stop a vehicle if they have reasonable suspicion to believe criminal activity is afoot, even though the person stopped presents no danger to the officer or anyone else. Second, the scope of legitimate police activity during a stop is narrowly limited to brief questioning.[17] Consequently, *Brignoni-Ponce* implicitly reenforces the *Terry* holding that frisks—which are an additional intrusion beyond the stop—are not permitted unless the officer reasonably fears for his safety.[18]

A very recent Supreme Court case, *United States v. Cortez*, — U.S. —, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), has reaffirmed the principles set forth in *Brignoni-Ponce*. In *Cortez*, Border Patrol officers found several sets of human footprints in the desert near the Mexican border. The footprints, plus other evidence, indicated to the officers that several groups of people had travelled north from the Mexican border to a U.S. Highway on weekend nights during clear weather. In each set of prints was a distinctive shoeprint of a chevron design. From this consistent marking, the officers concluded that an individual wearing shoes making those markings had been illegally leading Mexican nationals across the international border.

Based on their own *direct observations* of likely criminal activity, the officers set up surveillance of the area on the next clear weekend night. Having calculated the approximate transit time of a vehicle from their vantage point to the suspected pickup point (where the footprints ended), the officers observed vehicles traveling toward the pickup point and returning at a later time. Since the footprints had indicated that groups of eight to twenty people were illegally crossing the border, the officers focused their attention on vans, campers and the like.

After waiting for several hours, the officers observed one vehicle that aroused their suspicion because of its transit time, travel

---

**16.** In order to give the Government some guidance, the Court listed several "factors [that] may be taken into account in deciding whether there is reasonable suspicion to stop a car in the border area," *id.* at 884, 95 S.Ct. at 2581, including the characteristics of the area in which they encounter a vehicle, information about recent illegal border crossings, the driver's behavior, and the appearance of the vehicle. The Court also held that while the apparent nationality of the occupants may be a relevant factor in deciding to stop a car, that factor alone could not provide "reasonable suspicion" sufficient to justify a stop. *Id.* at 886–87, 95 S.Ct. at 2582–83.

**17.** In *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), the Court specifically declined to decide "whether an individual may be punished for refusing to identify himself in the context of a lawful investigatory stop which satisfies Fourth Amendment requirements." *Id.* at 53 n.3, 99 S.Ct. at 2641 n.3.

In *Dunaway v. New York*, 442 U.S. 200, 210 n.12, 99 S.Ct. 2248, 2255 n.12, 60 L.Ed.2d 824 (1979), however, the Court quoted with apparent approval a statement from Justice White's concurring opinion in *Terry*: "Of course, the person stopped is not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest." *Terry v. Ohio*, 392 U.S. 1, 34, 88 S.Ct. 1868, 1886, 20 L.Ed.2d 889 (1968) (White, J., concurring).

**18.** This point was driven home in *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), in which the Court struck down the conviction of the appellant, who was searched during a drug raid in a bar. "The initial frisk of Ybarra was simply not supported by a reasonable belief that he was armed and presently dangerous, a belief which this Court has invariably held must form the predicate to a patdown of a person for weapons." *Id.* at 92–93, 100 S.Ct. at 343 (footnote omitted).

route and size. They stopped the vehicle, and after a consent search of the truck, discovered Mexican nationals illegally in this country. The sole issue before the Supreme Court was whether the stop was legal under *Terry* standards.

Citing *Brignoni-Ponce*, the Court held that "[b]ased upon [the totality of the circumstances] the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* at ——, 101 S.Ct. at 694. While the police may rely on their training and experience in reaching reasonable inferences from the facts before them, the facts "must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." *Id.* As Justice Stewart stated in a concurring opinion, "the Border Patrol Officers had discovered an abundance of 'specific and articulable facts' which, 'together with rational inferences from them' entirely warranted a 'suspicion that the vehicle[ ] contain[ed] aliens who [might] be illegally in the country." *Id.* at 4103 (Steward, J., concurring) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975)).

A significant development in the Fourth Amendment law covering citizen-police confrontations occurred in *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). In *Mimms*, an officer stopped Mimms' car after he noticed it was being operated with an expired license plate. After approaching the car, the officer demanded that Mimms get out of the vehicle. Once Mimms was out of the automobile, the officer saw a bulge at Mimms' waist, frisked him, and discovered a loaded revolver. Mimms was convicted of carrying a concealed weapon and an unlicensed firearm.

The Supreme Court affirmed the convictions, basing its *per curiam* opinion on the *Terry* and *Brignoni-Ponce* standards of reasonableness. Since there was no issue that

the initial stop was reasonable—no one disputed that the car was being operated unlawfully—the Court's analysis focused on "whether the order to get out of the car, issued after the driver was lawfully detained, was reasonable and thus permissible under the Fourth Amendment." *Id.* at 109, 98 S.Ct. at 332. Even though there was nothing suspicious about the driver's behavior, the Court considered the safety of the officer weighty enough to justify the incremental intrusion in ordering the driver out of the car. The Court expressly noted that

we do not hold today that "whenever an officer has an occasion to speak with the driver of a vehicle, he may also order the driver out of the car." We hold only that once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the` vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.

*Id.* at 111 n.6, 98 S.Ct. at 333 n.6.[19]

## III. THE MEANING OF "ARREST" UNDER THE FOURTH AMENDMENT

The foregoing review of Supreme Court cases demonstrates that the Court's emphasis has been on fleshing out the stop and frisk doctrine first articulated in *Terry*. In fact, in only one case since *Terry* has the Court made even a modest attempt to delineate the differences between an arrest and a less intrusine stop. The distinction between an arrest and a stop is crucial in many cases, however, for an arrest can be made only on probable cause, while a stop is proper under the more relaxed "reasonable suspicion" standards of *Terry*.

*Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), is the one case in which the Court took the occasion to explain the legal distinctions between an arrest and a *Terry* stop. In *Dunaway*, the police acted on a tip to "pick up" the petitioner and bring him to police headquarters

---

**19.** *Mimms* made clear, however, that a protective search was permissible only if the officer had articulable reasons to believe that the sus-

pect was armed and presently dangerous. *See id.* at 111–12, 98 S.Ct. at 333–34.

for questioning about a robbery and homicide. After some interrogation the petitioner made inculpatory statements and sketches.

The state conceded that the police had no probable cause to arrest the petitioner when they brought him to the station. Instead, the state characterized the police action as less than an arrest, "and therefore permissible under the Fourth Amendment because the police had a 'reasonable suspicion' that petitioner possessed 'intimate knowledge about a serious and unsolved crime.'" *Id.* at 207, 99 S.Ct. at 2253. The Supreme Court rejected this argument and reversed the petitioner's conviction, reasoning that the police had arrested the petitioner without probable cause to do so.

The Court in *Dunaway* reaffirmed the general rule that an "arrest" may be made only on probable cause. *Terry* standards, by contrast, were applicable to intrusions that are "so much less severe than that involved in traditional 'arrests.'" *Id.* at 209, 99 S.Ct. at 2254. "The narrow intrusions involved in [*Terry* and its progeny] were judged by a balancing test rather than by the general principle that Fourth Amendment seizures must be supported by the 'long-prevailing standards' of probable cause, . . . only because these intrusions fell far short of the kind of intrusion associated with an arrest." *Id.* at 212, 99 S.Ct. at 2256 (citation omitted). In other words, any detention greater than requests for identification or an explanation of suspicious circumstances "must be based on consent or probable cause." *United States v. Brignoni-Ponce*, 422 U.S. 873, 882, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975).

In *Dunaway*, the Court found the seizure to be "in important respects indistinguishable from a traditional arrest." 442 U.S. at 212, 99 S.Ct. at 2556. First, the petitioner "was not questioned briefly where he was found." *Id.* Second, he was never informed that he was free to go and, in fact, would have been restrained had he tried to leave. Third, even though the police did not tell the petitioner that he was under arrest, such an omission "obviously [does]

not make petitioner's seizure even roughly analogous to the narrowly defined intrusions involved in *Terry* and its progeny." *Id.* at 212–13, 99 S.Ct. at 2256–57. The Court feared that to measure the seizure in *Dunaway* under the *Terry* standards "would threaten to swallow the general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause." *Id.* at 213, 99 S.Ct. at 2256.

## IV. ANALYSIS OF THIS CASE UNDER EXISTING CASE LAW

### 1. *The "Arrest" Without Probable Cause*

An examination of the facts before us indicates that the police action fell somewhere between the arrest in *Dunaway* and the classic *Terry* stop approved in cases like *Terry* and *Adams*. After spotting the Oldsmobile, and without noticing any suspicious circumstances, the officers partially blocked the appellants' car, making it difficult for them to leave. Getting out of their car, the officers approached each side of the Oldsmobile with guns drawn, ordering the appellants to keep their hands in sight and to get out of the car. Before that moment the officers had asked the appellants no questions about their identity or their activity. The officers had not inspected the car, and they had seen no evidence of unlawful activity. After White left the car, Detective Hill holstered his gun, grabbed White from behind, and took him to the front of the car. Detective Sanchez-Serrano, meanwhile, had "placed [Anderson] on the hood of the vehicle."

Viewed in its totality, I submit that this scenario is closer to an arrest than a less intrusive stop. This conclusion derives from the limited nature of *Terry* stops, which are narrow exceptions to the usual Fourth Amendment standards. *See Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972) (brief stop may be reasonable to determine individual's identity or to "maintain the status quo momentarily"); *Dunaway v. New York*, 442 U.S. 200, 212, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979) (*Terry* stops fall "far short of the kind of intrusion associated with an ar-

rest"); *Ybarra v. Illinois*, 444 U.S. 85, 93, 100 S.Ct. 338, 343, 62 L.Ed.2d 238 (1979) (*Terry* "created an exception to the requirement of probable cause, an exception whose 'narrow scope' this Court 'has been careful to maintain'"). In order to avoid the stricter probable cause standards, such seizures must be considerably less intrusive than a traditional arrest.

In the present case, by contrast, it is difficult to imagine what the police would have done differently in arresting the appellants. The appellants were taken from their car at gunpoint,[20] and forcibly led to the front of the car. They were asked no questions. Rather than maintaining the status quo, the officers escalated the confrontation until enough evidence had been produced to justify an arrest.

While the circuits are by no means unanimous, several appellate courts have held that under circumstances similar to those posed here, the use of drawn guns may escalate a seizure to an arrest, thus requiring probable cause in *United States v. Lampkin*, 464 F.2d 1093, 1095 (3d Cir. 1972), the court said that

> it seems evident that, under the circumstances before us, the arrest was effectuated at the instant the agents, with guns drawn, halted appellant and informed him of who they were. At that instant he was under the control of the officers who had demonstrated an intention to take him into custody under their authority as government agents. There was

absolute restraint of appellant which was abundantly clear to him.

Other courts have rendered similar holdings. *See United States v. Troutman*, 458 F.2d 217 (10th Cir. 1972) (the arrest was effective when the officers pulled over the burglary suspects and approached the car with drawn weapons); *United States v. Larkin*, 510 F.2d 13, 14 n.1 (9th Cir. 1974) ("a confrontation with a vehicular blockade and drawn weapons cannot be equated with an investigative detention"); *United States v. Strickler*, 490 F.2d 378, 380 (9th Cir. 1974) ("we simply cannot equate an armed approach to a surrounded vehicle whose occupants have been commanded to raise their hands with the 'brief stop of a suspicious individual in order to determine his identity or to maintain the status quo momentarily while obtaining more information' which was authorized in *Williams*").

The majority fails in its attempt to justify the excessive police force used in this case by arguing that police must be prepared for any eventuality. Although the detectives testified that they feared the appellants might be armed, they could point to no facts to support their hunch in this case.[21] Even the majority concedes that statistics show that the vast majority of drug suspects arrested are not armed at the time of arrest. *Ante* at 35 n.29. In this case, the anonymous tipster, who gave detailed information about the appellants, made no mention of guns or weapons. In

**20.** *It seems academic to worry whether the police were pointing their weapons directly at appellants or not. Any reasonable person, seeing drawn guns, would feel under the same absolute custodial restraint, wherever the officers' guns were pointed.*

**21.** The majority opinion makes repeated reference to the fact that the appellant White fidgeted momentarily before getting out of the car, as if *to suggest that the police reasonably had* their guns drawn. *See, e. g., ante* at 34 and 35 n.31. In fact, the trial judge found that Sanchez-Serrano drew his gun, not in response to suspicious activity, but because Hill drew his gun. "The police approached the vehicle. According to Officer Hill, he had his gun drawn but not pointed and Officer Sanchez said that he pulled his gun out when he saw Officer Hill

draw his gun." Tr. 92. Moreover, although Hill asserted that he had a general "concern" for his safety, he did not testify that he drew his gun because of White's fidgeting. Hill testified that:

> A: I might have had it out, I'm not certain at this point [when he initially approached the car], but there did come a time when I did have it out, yes.
> Q: But you're not certain when that time was?
> A: It was during the time that I approached the car and prior to getting out of the car. That's correct.

Tr. 21. There is absolutely nothing in the testimony of Hill to indicate that he saw anything, as he approached the appellants' car, to cause him to fear for his safety.

addition, there was nothing to indicate that the appellants had a record of violent crimes. Moreover, the police behavior in this case belies their purported concern about their safety. The record reveals that after White got out of the car, but before Hill had frisked him for weapons, Hill holstered his gun in order to pick up the tinfoil.[22] Rather than a means to protect himself or maintain the status quo, the drawn weapon was a tool to place the appellants under absolute restraint.

In many ways the present case parallels *United States v. Ramos-Zaragosa*, 516 F.2d 141 (9th Cir. 1975), in which the police had received a detailed tip that the defendants were transporting drugs. The police stopped the defendants at gunpoint and ordered them out of their vehicle. The court held that the defendants had been arrested:

> The arrest was completed when the appellant and his passenger complied with the order to get out of the pickup. The encounter of the agents and the appellant and his passenger was an arrest, as opposed to an investigatory stop, because the agents at gun point, under circumstances not suggesting fears for their personal safety, ordered the appellant and his passenger to stop and put up their hands.

*Id.* at 144.

Under certain circumstances, force may be necessary to effect a stop. As stated in *United States v. Thompson*, 558 F.2d 522, 524 (9th Cir. 1977), *cert. denied*, 435 U.S. 914, 98 S.Ct. 1466, 55 L.Ed.2d 504 (1978):

> A police officer attempting to make an investigatory detention may properly display some force when it becomes apparent that an individual will not otherwise comply with his request to stop.

In *Thompson* the police drew their guns only after the van "began to move and then suddenly lurched forward." *Id.* In the present case, there was no factual basis to believe the appellants were armed, and

there was no evidence that they sought to escape detention.

By contrast, in many of the cases cited by the majority, the suspects were reportedly armed or sought to evade detention thus making necessary some show of force. *See United States v. Diggs*, 522 F.2d 1310, 1314 (D.C.Cir.1975), *cert. denied*, 429 U.S. 852, 97 S.Ct. 144, 50 L.Ed.2d 127 (1976) (agents stopped "the three appellants, at least two of whom had been armed during the bank robbery"); *United States v. Richards*, 500 F.2d 1025 (9th Cir. 1974), *cert. denied*, 420 U.S. 924, 95 S.Ct. 1118, 43 L.Ed.2d 393 (1975) (the appellants had loaded a rifle on their plane; the agents drew their weapons only when the appellant would not shut off the engine of the plane as it was about to take off); *United States v. Bull*, 565 F.2d 869 (4th Cir. 1977), *cert. denied*, 435 U.S. 946, 98 S.Ct. 1531, 55 L.Ed.2d 545 (1978) (one of the parties wore a jacket on a warm summer night, alerting the officer to the possibility of a concealed weapon); *United States v. Maslanka*, 501 F.2d 208, 213 n.6 (5th Cir. 1974), *cert. denied*, 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975) (officer drew gun only after stopping appellants following a five-mile, high-speed chase; also, the court found that probable cause existed before the stop).

The point is that under the circumstances in this case—the drawn guns, the order to exit with hands in plain sight, a suspected crime not necessarily involving violence, and the complete absence of any evidence of weapons—the police activity far exceeded any reasonable definition of an investigative stop. Since current Fourth Amendment doctrine recognizes only two types of seizures—"stops" and "arrests"—I conclude that the police arrested the appellants before they saw the drugs.

In *Dunaway* the petitioner was taken involuntarily to a police station, but this surely is not a condition essential to a finding of an "arrest." Nor is it necessary for a police

---

**22.** The majority claims that the record "makes clear" that Sanchez-Serrano was "covering" White when Hill holstered his gun and picked up the drugs. *See ante* at 32 n.16. In my

view, there is no way that the record of testimony at the cited pages can be read to support what the majority suggests.

officer to expressly declare an intention to "arrest" in order for full Fourth Amendment protections to apply. Indeed, in *Dunaway*, the Court cited *Brignoni-Ponce* for the proposition that:

> The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, *but any further detention or search must be based on consent or probable cause.*

442 U.S. at 212, 99 S.Ct. at 2256 (emphasis in original). At another point in the opinion, the *Dunaway* Court noted that

> detention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest.

442 U.S. at 216, 99 S.Ct. at 2258.

In the present case, the conduct of the police looks more like the "detention for custodial interrogation" forbidden by *Dunaway*, than the significantly less obtrusive stop permitted by *Terry*. Because, as the Government concedes, there was no probable cause for arrest, the arrests were therefore illegal, and the appellants' motion to suppress evidence should have been granted.

## 2. The "Unreasonable" Stop

Even if the initial seizure in this case did not amount to an arrest, this court must nonetheless decide whether the seizure meets the standards set forth in *Terry* and subsequent cases. For the reasons set out below, I conclude that the police did not have sufficient legal justification for stopping the appellants and that, consequently, the police conduct violated the Fourth Amendment. Furthermore, even if some sort of stop was justified under the circumstances, the scope of the seizure in this case plainly exceeded permissible bounds.

The starting point for our analysis is *Terry*, which requires a reviewing court to balance the public interest in the investigative seizure against the resulting interference with individual liberty. A seizure falling short of an arrest is permissible under the Fourth Amendment "only if [the officers] are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the appellants are engaged in illegal activity. *United States v. Brignoni-Ponce*, 422 U.S. at 884, 95 S.Ct. at 2581.

Because the police observed no suspicious activity, the only possible basis for the seizure in the present case is the anonymous tip. However, because of the informant's anonymity, the informant was unknown to the police and, so far as the officers knew, the tipster had not previously given them reliable information. Moreover, the informant did not tell the police how he or she acquired the information about the appellants. The only indication that the tip was reliable was the corroboration of entirely innocent details of the appellants' activity.[23]

The present case contrasts sharply with the facts and the language of *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), in which the Supreme Court held that the police acted justifiably on an informant's tip in stopping and frisking a man seated in a car. In the opinion, the Court pointed to three factors to support its holding. First, the "informant was known to [the officer] personally and had provided him with information in the past." *Id.* at 146, 92 S.Ct. at 1923. In the present case, the anonymous tipster was, of course, unknown to the police and had not provided them with information in the past. As the Court emphasized, *Adams* presented a "stronger case than obtains in the case of an anonymous telephone tip." *Id.* Thus, the Court has expressly distinguished the present case from *Adams*.

---

**23.** It is also significant that the tipster, who otherwise gave a detailed description, did not say or imply that the appellants would be armed. Moreover, before the seizure the police observed nothing to indicate that the appellants were armed. As I observed earlier in this opinion, the police could point to no facts indicating that they faced a dangerous situation. In fact, a search of the appellants turned up no weapons.

Second, the Court emphasized that the reliability of the tip in *Adams* was enhanced because the tipster personally approached the officer to report a possible crime; the tipster could have been arrested if he had given the officer a false report. In the present case, the informant—because he was anonymous—could not have been arrested or questioned closely about his information. Third, the Court considered the police action to be reasonable in part because the officer was acting alone, at night, in a high crime area, and with a suspect who was reportedly armed.[24] Almost the opposite situation existed in the present case. There was not one officer present, but two; it was not night, but dusk, and because the dome light of the car was on, the area was well lighted; there was no evidence offered at the suppression hearing to indicate that the police were in a high crime area; and there was no evidence, even from the informant, that these appellants were armed. Thus, while the tip in *Adams* provided reasonable suspicion, meeting the *Terry* standards, the anonymous tip in this case simply is not reliable enough to permit the wholesale invasions of personal liberty that occurred.

Moreover, the present case is quite unlike *United States v. Cortez*, —— U.S. ——, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). In *Cortez*, the Court upheld a stop made only after the police directly observed evidence of criminal activity and had circumstantial evidence linking the petitioners to that activity. The majority opinion here refers to *Cortez, see ante* at 45–46 n.53, but it omits entirely any reference to the second of the two tests enunciated by the Supreme Court: *i. e.,* that police observations and analyses of available data "must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. . . . '[T]his demand for specificity in the information upon which police action is predicated is *the central teaching of this Court's Fourth Amendment jurisprudence.'*" *Id.* at ——, 101 S.Ct. at 695, quoting *Terry v. Ohio*, 392 U.S. 1, 21 n.18, 88 S.Ct. 1868, 1879 n.18,

20 L.Ed.2d 889 (1968) (emphasis in *Cortez*). "Based upon [the totality of the circumstances] the detaining officers must have a particularized objective basis for suspecting the particular stopped of criminal activity." *Id.* The majority opinion's oblique reference to *Cortez* does not illuminate the central dispute in this case. *Cortez* involved neither an anonymous tip nor the use of excessive force—the central issues in the present case. Instead, *Cortez* concerned the reasonableness of police conduct in response to *their own observations* of criminal activity. Moreover, even though *Cortez* is factually distinct from the present case, the broad legal holdings in *Cortez* are entirely consistent with our conclusion about the legality of the stop of White and Anderson.

In *Cortez* the police were able to point to specific factual observations indicating both that criminal activity had taken place and that the petitioners were implicated. In the present case, by contrast, the police observed no suspicious activity and relied solely on an anonymous tip. It is precisely because the officers had no particularized basis for suspecting White and Anderson of criminal activity that I differ with the majority. Quite unlike the Border officers in *Cortez*, the police in this case had observed nothing to believe that criminal activity was afoot, let alone that the appellants were involved. Instead, they acted solely on an anonymous tip—which was vague as to critical details concerning the crime itself. There was simply no particularized, objective basis to suspect the appellants were violating the law.

Several circuit courts that have had to decide whether a tip can meet the *Terry* standards for a stop have attached great weight to the difference in reliability presented by an anonymous tip versus one given face-to-face to police. In *United States v. Sierra-Hernandez*, 581 F.2d 760 (9th Cir.), *cert. denied*, 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978), an unknown,

---

**24.** In addition, the officer in *Adams*, unlike the detectives in the present case, did not approach

the vehicle with his gun drawn.

untested tipster told police of a truck carrying drugs at a specific place. The police stopped the truck and after a consent search found the drugs. The court upheld the appellant's conviction, finding the tip to be reliable enough to justify a stop: the place identified by the tipster was in the past a known point for smuggling drugs, the tip was detailed and the tipster could have been made available for further questioning if the officer had judged it necessary.

The court in *Sierra-Hernandez* noted that: "Unlike a person who makes an anonymous telephone call, this informant confronted the agent directly.... The informant was in a position to be held accountable for his intervention." *Id.* at 763. *See United States v. Gorin*, 564 F.2d 159, 160 (4th Cir. 1977), *cert. denied*, 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978) (although the original tip was anonymous, the police later spoke face-to-face with the tipster before stopping the appellant. The "detectives could have identified the informant for further questioning or testimony at trial"); *United States v. Unverzagt*, 424 F.2d 396 (8th Cir. 1970) (upheld a stop based on a tip given by known informants); *United States v. Perez-Esparza*, 609 F.2d 1284 (9th Cir. 1979) (upheld stop based on known, reliable informant); *United States v. Jones*, 599 F.2d 1058 (9th Cir. 1979) (stop upheld because appellants had been convicted of a similar theft, and police received a tip from an identified citizen informant, as well as from an anonymous source); *United States v. Andrews*, 600 F.2d 563 (6th Cir.), *cert. denied*, 444 U.S. 878, 100 S.Ct. 166, 62 L.Ed.2d 108 (1979) (although the stop was based on an anonymous tip, it involved some indicia of criminal activity verifiable by the police: the informant stated that the drugs were to be delivered to an individual the police recognized as a known drug dealer).

In a case that strongly parallels our own, *United States v. McLeroy*, 584 F.2d 746 (5th Cir. 1978), police stopped and later arrested the appellant based on an anonymous tip that he might have a stolen car and a sawed-off shotgun. The informant gave the appellant's name, the license tags of the car, and the address where it was parked. The court found the stop unreasonable since the "record contains nothing about the informant's identity or reliability. Nor does it shed any light on the informant's basis for asserting that the information contained in the tip was accurate." *Id.* at 748. The court found the corroboration to be "so slight that it created no justification for believing that the informant was 'relying on something more substantial than a casual rumor.' Reasonable suspicion requires more than this minimal corroboration of innocent details." *Id.* (citation omitted).

The point, of course, is not that all courts have adopted a per se rule prohibiting police from acting on anonymous tips. Rather, the concern here is that under the majority's holding the police are now free to detain forcibly—at gunpoint—individuals on the basis of an anonymous tip and without observing any suspicious activity, for crimes that do not involve an immediate danger to the public-at-large or police officers.

As Professor Wayne LaFave has aptly stated:

> [T]he anonymous information ordinarily raises a possibility, but not a substantial possibility, of criminal conduct. But, in this context the word "substantial" takes on special importance; whether the possibility is great enough to justify stopping the suspect who appeared as predicted may well depend upon the nature of the crime.... Action on the basis of anonymous information, then, should be allowed only in cases involving the risk of "serious personal injury or grave irreparable property damage" ....

LaFave, "Street Encounters" and the Constitution: *Terry, Sibron, Peters*, and Beyond, 67 Mich.L.Rev. 39, 78 (1968). As LaFave noted, the police need not ignore the information—they should begin surveillance. But there is no basis for a seizure.

It is also necessary to step back from the majority's detailed case analysis—which the majority virtually admits is inconclusive—

to gain some perspective on the consequences of its holding. Even if a stop were justified under these circumstances, the majority's opinion has drained all meaning from the command in *Terry* that an investigative seizure be "reasonably related in scope to the justification for [its] initiation." 392 U.S. at 29, 88 S.Ct. at 1884. For now, absent any suspicious circumstances observed by the police, and based entirely on an anonymous tip, the police can at gunpoint drag someone from his car and forcibly place him on the hood of the car—all of this to ascertain his identity and "maintain the status quo momentarily." Recall that in the present case the appellants did not attempt to flee, nor did they attempt to resist the officers or refuse to answer any questions.[25] Moreover, the defendants were not suspected of committing a violent crime. I respectfully submit that to allow this result is to indulge a strained and perverse reading of *Terry*.

Rather than making a limited intrusion, the police officers in this case immediately and forcibly detained the appellants, distorting the concept of a *Terry* stop beyond recognition. If a stop was justified, the police could have approached the car, and asked for identification and for other details. Had the appellants attempted to leave, force may have been justified. Under the circumstances, however, the seizure was not "reasonably related in scope" to its justification. The wholesale invasion of the appellants' personal security exceeded the permissible bounds of a stop based on these facts.

## V. CONCLUSION

One final concern about the majority's opinion must be mentioned, for it highlights the broad extent of the holding in this case and illustrates the significant differences in our viewpoints regarding the enforcement of Fourth Amendment rights. In the conclusion, the majority opinion states that the stop "would at most have involved temporary inconvenience." *Ante* at 45. This conclusion, in my mind, is completely at odds with the facts of this case. Being forced out of a car at gunpoint, grabbed from behind, and "placed on the hood of the vehicle" constitute, to my mind, not temporary inconvenience, but gross intrusions into the appellants' personal security.[26] Had the police in fact performed a limited *Terry* stop, perhaps the majority's sanguine assessment of this case would be justified. Because I cannot agree with the majority's view of either the nature of the police conduct, or its justification, I believe the court has failed in its duty

> to guard against police conduct which is overbearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires.

*Terry v. Ohio,* 392 U.S. at 15, 88 S.Ct. at 1876. Accordingly, I dissent.

25. *The majority opinion repeatedly emphasizes the possibility of escape as a justification for the police action in this case. See, e. g., ante* at 45 (asserting that the appellants were in a position to move away). This emphasis is at odds with the testimony of Detective Hill, who said that it would have been difficult to move the car. Tr. 19. At the suppression hearing the police themselves did not indicate that they believed that the appellants were considering fleeing, and they testified that they had seen no evidence of flight. Tr. 37. The majority's resort to speculation about possible motives for the police conduct in this case only strengthens the conclusion that the police conduct was unreasonable.

26. The majority opinion seeks to deny its apparent holding that an anonymous tip can justify the police action in this case when it states that Anderson was seized "only after Hill had seen White make the fidgeting gesture." *See ante* at 46 n.54. In fact, Sanchez-Serrano had seen nothing suspicious to justify forcibly putting Anderson on the hood of the car.